No. 91,518

STATE OF KANSAS, *Appellee*, v. TREVER J. CORBETT, *Appellant*.

(130 P.3d 1179)

Opinion filed March 24, 2006.

*Michael S. Holland*, of Holland and Holland, of Russell, argued the cause, and *Michael S. Holland II*, of the same firm, was with him on the brief for appellant.

*Keith E. Schroeder*, district attorney, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

ROSEN, J.: Trever Corbett appeals his conviction for the first-degree premeditated murder of his ex-wife Crystal Casey, claiming that: (1) the trial court erroneously admitted transcripts of two witnesses' depositions; (2) the trial court erroneously admitted testimony from two eyewitnesses; (3) the trial court violated his right to confrontation by limiting his cross-examination of an eyewitness; (4) the trial court improperly admitted hearsay from the decedent; (5) the evidence was insufficient to support his conviction; (6) the prosecutor committed misconduct during closing argument; and (7) the trial court erroneously admitted evidence.

Crystal Casey married Trever Corbett in August 1995. Their daughter, Emily, was born in January 1996. Crystal and Corbett divorced in December 1996. In their divorce decree, the court ordered joint legal custody of Emily and designated Crystal as the primary residential parent. Although Crystal and Corbett argued over the custody of Emily, the two eventually became friends. In fact, Corbett was one of the pallbearers at Crystal's funeral.

Crystal met her second husband, Shane Casey, in February 1997. She married Shane in September 1997. Crystal and Shane's

first child, a daughter named Abbey, was born in April 1998. Their son, Kaleb, was born in December 1999. Crystal and Shane were divorced in April 2000.

Shortly before her death in June 2000, Crystal had decided to move with her children to Wichita to attend beauty school. Crystal planned to live with her sister, Melissa, and Melissa had given Crystal a key to Melissa's home. Corbett was very upset about Emily moving to Wichita. Crystal told her mom that Corbett acted like she was moving "clear across the country" rather than 35 minutes away. Corbett told Crystal that he wanted Emily to live with him instead. However, Crystal refused and insisted on moving with Emily to Wichita.

At approximately 11 p.m. on June 25, 2000, Crystal's best friend and part-time roommate, Bridgette Darling, left Crystal's apartment with her boyfriend. When Bridgette returned the next morning at approximately 8 a.m., she discovered Crystal's body lying at the bottom of the entry stairs in Crystal's apartment. Stiff from rigor mortis, Crystal's body was partially blocking the front door, and Bridgette had to push Crystal's body aside to enter the apartment.

Bridgette found the door to Crystal's apartment unlocked, which was very unusual. There were no signs of forced entry and no signs of violence in Crystal's apartment. Nothing appeared to have been stolen, and Crystal had not been sexually molested. Two of Crystal's three children Abbey, age 2, and Kaleb, age 7 months, were in the apartment. Neither of the children had been harmed. Crystal's 4-year-old daughter, Emily, was not home with Crystal that night. Emily had been with her father, Trever Corbett, for several days.

Bridgette immediately called Crystal's mother, who advised her to call 911. A few minutes later, police and an emergency paramedic arrived. The police had to move Crystal's body slightly to gain entry to the apartment. The paramedic, who put on gloves after receiving the emergency call, drove to the apartment and immediately checked Crystal's pulse by touching her neck and then touched Crystal's arm to note the rigor in her body.

An autopsy revealed that Crystal died from manual strangulation. She had multiple bruises all over her body and scratches on

her face, indicating that she had been involved in a violent struggle. Because of the struggle, Crystal's attacker had to reposition his hands around her neck to compensate. The deputy coroner swabbed Crystal's skin and clipped Crystal's fingernails to test for the presence of her attacker's DNA.

Crystal's relationship with her second ex-husband, Shane, was very tumultuous. Crystal and Shane argued 2 days before Crystal's death. Because of the nature of Crystal's relationship with Shane, Crystal's mother and the police initially suspected that Shane had killed her.

Jenny Williams lived in the same apartment complex as Crystal. Williams had grown up in the same town as Crystal and had gone to high school with Corbett. Williams' daughter also attended the same preschool as Emily. At 1:30 to 1:45 a.m. on June 26, 2000, Williams and her boyfriend, Bryan Miller, were walking around the apartment complex. Williams and Miller observed a partially dressed man walking from the doorway to Crystal's apartment. The man was carrying a pile of clothes. Williams thought she recognized the man as Corbett, so she said hello. The man did not respond and pulled the pile of clothes closer to his face.

When Williams and Miller heard about Crystal's death the next morning, they both decided to contact the police to report seeing a man outside Crystal's apartment. Williams and Miller approached the police while they were at Crystal's apartment. Williams initially told Detective Rayburn that she thought she had seen Corbett outside Crystal's apartment but was not certain of his identity because he did not respond when she spoke to him. Williams also told two of her friends and her mother that she had seen Corbett outside Crystal's apartment. Erin Bailey, one of Williams' friends, worked with Crystal. Erin Bailey told Williams that Williams must have been mistaken about seeing Corbett because Corbett was Crystal's "nice" ex-husband. According to Erin Bailey, Williams must have seen Shane because he was the ex-husband who always fought with Crystal.

A few hours after Williams reported what she had seen, Detective Rayburn showed Williams a photographic lineup to see if she could identify the man outside Crystal's apartment. The photo-

graphic lineup included Shane's picture but did not include Corbett's picture. Williams did not know Shane, but she selected his picture from the photographic lineup. Miller did not know Corbett and did not identify the man outside Crystal's apartment by name. However, Miller provided police with a detailed description of the man he had seen and stated that he would probably recognize the man if he saw him again. After showing the photographic lineup to Williams, Detective Rayburn approached Miller with the same lineup. Miller did not initially select a picture from the lineup. Detective Rayburn accused Miller of smoking marijuana and ordered Miller to come to the police station another day to make an identification. Before Miller went to the police station, he spoke with Williams, and Williams told him which picture she had chosen. When Miller met with Detective Rayburn, he chose the same picture as Williams, later stating he felt pressured to choose one of the pictures in the lineup.

A couple of months later, Williams and Miller appeared for separate depositions with the district attorney. Williams reaffirmed her identification of Shane's picture. Miller, however, recanted his identification, stating that he could not identify Shane's picture under oath because Shane was not the person Miller had seen outside Crystal's apartment.

Sometime after the depositions, Williams also had second thoughts about her identification of Shane. She expressed her concerns to a police officer that moonlighted as a security guard at her place of employment. In January 2001, police approached Williams and Miller with a second photographic lineup, which included both Corbett's and Shane's pictures. Williams selected Corbett's picture from the second lineup, stating that she had initially selected Shane's picture because of what Erin Bailey said about Shane and because the man did not respond to her greeting and she assumed that Corbett would. Without coaching from Williams, Miller selected Corbett's picture from the second lineup, stating that he was 70-75% certain of his identification.

In January 2001, the police received the results of the DNA testing for the swabs from Crystal's skin and her fingernail clippings. The DNA swabs from Crystal's right upper arm revealed a

DNA profile consistent with Corbett. Because the genetic material only provided a partial profile, DNA experts calculated that 1 in 25 people in the Caucasian race would have the same DNA profile as that found on Crystal's right upper arm.

Corbett was excluded as a contributor to the DNA present on Crystal's neck and left elbow. Testing indicated that the DNA on Crystal's neck and left elbow were contributed by an unknown male. Shane was excluded as a contributor for the DNA on Crystal's neck, left elbow, and right upper arm.

DNA testing of Crystal's fingernail clippings also revealed a minor DNA contribution from a person other than Crystal. The minor DNA profile was consistent with Corbett's DNA profile and inconsistent with Shane's DNA profile, excluding Shane as a possible contributor. The probability of finding another Caucasian with the same minor DNA profile as that found in Crystal's fingernail clippings was 1 in 2000. Notably, all of Crystal's family members including the 7-month-old son were excluded as contributors of DNA.

The State sent part of the sample taken from Crystal's fingernails to Reliagene Labs (Reliagene) for more DNA testing. Reliagene used a procedure that ignored female DNA and focused on the male DNA markers. Reliagene tested six markers in the DNA profile and determined that neither Corbett nor Shane could be excluded as contributors to the DNA in Crystal's fingernail clippings.

In addition to DNA evidence linking Corbett to Crystal's death, police discovered Corbett's thumbprint on the peephole in Crystal's front door. By January 2001, police had eliminated Shane as a suspect because his alibi appeared valid and the DNA evidence excluded him as a contributor.

In May 2001, the State filed a complaint charging Corbett with first-degree premeditated murder and issued a warrant for his arrest. Corbett's preliminary hearing was heard in August 2001. Williams testified that she recognized Corbett coming out of Crystal's apartment because she knew him from high school. Williams further testified that she had previously misidentified Shane because his picture was the only recent-looking picture; she did not want it to be Corbett; her friend Erin Bailey convinced her that it must

have been Shane because Shane was the bad ex-husband; and she wanted to help the police. Miller also testified and identified Corbett as the person he saw outside Crystal's apartment the night she was murdered. Miller testified that he initially selected Shane's picture from the first photographic lineup because that was the picture Williams had selected and he felt pressured to choose one of the pictures.

Following the preliminary hearing, the district court found Williams' and Miller's identifications unreliable and concluded that the State had failed to establish probable cause that Corbett murdered Crystal. The district court dismissed the case against Corbett.

The State appealed the dismissal of Corbett's complaint to the Kansas Court of Appeals. In January 2003, the Court of Appeals reversed the district court's dismissal, finding identity testimony, DNA, and fingerprint evidence more than adequate to establish probable cause and remanded the matter for further proceedings. *State v. Corbett*, 31 Kan. App. 2d 68, 76, 59 P.3d 1054 (2003).

After Corbett was initially arrested, he called Crystal's friend Bridgette from jail and told her that he had taken a chest of Crystal's things to his brother's house in Great Bend to prevent police from finding it. In October 2002, while the State's appeal was pending, Detective Rayburn executed a search warrant at Corbett's brother's home in Great Bend. Detective Rayburn found a chest with Crystal's jewelry box, some of Crystal's jewelry, and a key to Crystal's sister's trailer-home in Wichita. Crystal's mother advised Detective Rayburn that those items were in Crystal's possession before her death and there was no way that Crystal would have given them to him.

In January 2003, the KBI extracted a second sample from Crystal's fingernail clippings and ran another DNA analysis. In the second sample, the KBI found three additional genetic markers in the minor DNA profile. The minor DNA profile from the second sample was consistent with Corbett's DNA profile. Because the second sample provided additional DNA markers for evaluation, the probability of finding another Caucasian with the same DNA profile was reduced to 1 in 52,000.

The KBI sent part of the second sample from Crystal's fingernails to Reliagene for retesting because Reliagene had developed new testing for five additional markers. Based on its testing of the additional five genetic markers, Reliagene concluded that the minor DNA profile found in Crystal's fingernail clippings was consistent with Corbett's DNA profile and inconsistent with Shane's DNA profile.

At Corbett's trial, the State admitted the DNA and fingerprint evidence to establish Corbett's presence at the scene of Crystal's murder. The State also presented testimony that Crystal's jewelry, jewelry box, and her sister's house key were in Corbett's possession even though Crystal would not have given him those items prior to her death. Both Williams and Miller testified about observing Corbett outside Crystal's apartment. Crystal's uncle testified that Corbett acted very nervously and admitted killing Crystal when questioned about it prior to Crystal's funeral. Corbett's cellmate testified that Corbett said he had a fight with Crystal and she fell down the stairs.

After less than 12 hours of deliberation, a jury convicted Corbett of first-degree premeditated murder. The district court sentenced Corbett to life in prison. Corbett appeals his conviction. His appeal is before this court pursuant to K.S.A. 22-3601(b)(1).

## Admission of Deposition Transcripts

Corbett claims that the trial court improperly admitted the transcripts from Williams' and Miller's depositions. He raises three arguments to support his claim. First, Corbett argues that he did not have the opportunity to cross-examine Williams and Miller at their depositions. Second, Corbett argues that the depositions were not taken in compliance with K.S.A. 60-230(e) (deponent's signature), K.S.A. 60-232(a) (use of deposition only against a party present or represented at the deposition), K.S.A. 60-460(c)(2)(B) (hearsay exception for depositions), or K.S.A. 22-3211 (deposition of a witness who is unable or prevented from attending trial). Third, Corbett argues that the depositions were not admissible to impeach Williams and Miller.

When examining a challenge to the admission of evidence, an appellate court first considers whether the evidence is relevant. Relevant evidence is any "evidence having any tendency in reason to prove any material fact." K.S.A. 60-401(b). All relevant evidence is admissible except as otherwise provided by statute. K.S.A. 60-407(f). "Once relevance is established, evidentiary rules governing admission and exclusion may be applied either as a matter of law or in the exercise of the district judge's discretion, depending on the contours of the rule in question." *State v. Carter*, 278 Kan. 74, 77, 91 P.3d 1162 (2004).

The depositions at issue here are relevant because they provide detailed descriptions of the man that Williams and Miller observed outside Crystal's apartment the night Crystal was murdered. Williams' deposition is also relevant because it contradicts her trial testimony. Miller's deposition is relevant because it contradicts his initial identification of Shane in the first photographic lineup.

K.S.A. 60-460(a) provides:

"Evidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated, is hearsay evidence and inadmissible except:

"(a) *Previous statements of persons present*. A statement previously made by a person who is present at the hearing and available for cross-examination with respect to the statement and its subject matter, provided the statement would be admissible if made by declarant while testifying as a witness."

Admitting prior testimony from witnesses who are testifying at the defendant's trial is within the purview of K.S.A. 60-460(a). In *Carter*, an eyewitness identified the defendant at the preliminary hearing and the defendant's first trial but stated that he could not identify the defendant at the second trial and did not remember doing so in the prior proceedings. The trial court permitted the prosecutor to read portions of the eyewitness' previous testimony and question the witness about the passages. The *Carter* court upheld the admission of the eyewitness' prior testimony pursuant to K.S.A. 60-460(a). 278 Kan. at 79.

Similarly, in *State v. Osby*, 246 Kan. 621, 793 P.2d 243 (1990), two eyewitnesses testified for the State. The same eyewitnesses had testified in other criminal trials about the same events at issue in

Osby's trial. The trial court allowed the State to admit portions of the transcripts from the eyewitnesses' testimony in the previous criminal trials where Osby was not a party. The *Osby* court upheld the admission of the transcripts pursuant to K.S.A. 60-460(a) because both witnesses testified at Osby's trial and were available for cross-examination. 246 Kan. at 631-33.

Like the eyewitnesses in *Carter* and *Osby*, both Williams and Miller testified at Corbett's trial and were available for cross-examination. In fact, Corbett's defense counsel extensively cross-examined both witnesses, incorporating significant portions of their deposition testimony in his questions. Thus, K.S.A. 60-460(a) applies in this case regardless of whether Corbett had the opportunity to cross-examine Williams and Miller at the depositions or whether the depositions were used to impeach their testimony. Likewise, K.S.A. 60-460(a) applies independently under these facts without relying on the State's compliance with K.S.A. 60-230(e), K.S.A. 60-232(a), K.S.A. 60-460(c)(2)(B), or K.S.A. 22-3211.

To be circumspect in our analysis, we note that, even though the transcripts at issue in this case are testimonial in nature, their admission is not precluded by *Crawford v. Washington*, 541 U.S. 36, 158 L. Ed. 2d 177, 124 S. Ct. 1354 (2004). In *Crawford*, the State sought to introduce the transcript from the police interrogation of the defendant's wife, who did not testify at trial because of the marital privilege. Observing, that testimonial evidence "applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations," the *Crawford* Court concluded that the defendant must have had a prior opportunity to cross-examine the declarant if the State seeks to admit a testimonial statement from the declarant when the declarant is unavailable to testify at trial. 541 U.S. at 68. Because the defendant did not have the opportunity to cross-examine his wife during her police interrogation, the *Crawford* Court held that the admission of the interrogation transcript violated the defendant's Sixth Amendment right to confrontation. 541 U.S. at 68.

*Crawford* does not apply in this case because both Williams and Miller were available for cross-examination and testified at trial. The language in K.S.A. 60-460(a), which limits the application of

the statute to "a person who is present at the hearing and available for cross-examination," specifically protects the defendant's right to confrontation by requiring the person to be available for cross-examination at trial. Thus, the application of K.S.A. 60-460(a) negates the application of *Crawford*.

Although we find the trial court's admission of the entire transcripts to be unnecessary and cumulative, we conclude that, under these facts, the trial court properly admitted Williams' and Miller's deposition transcripts pursuant to K.S.A. 60-460(a).

### Eyewitness Testimony

In addition to complaining about the admission of Williams' and Miller's deposition transcripts, Corbett claims that Williams and Miller should not have been allowed to testify regarding their eyewitness identifications. Corbett argues that their identifications were unreliable. Corbett points to the conclusions of the preliminary hearing judge who stated that "the testimony of [Jenny] Williams is of highly questionable reliability and credibility." Refusing to bind Corbett over for trial, the preliminary hearing judge concluded that neither Williams' nor Miller's identifications were reliable.

An appellate court's review of an eyewitness identification is a due process determination involving a mixed question of law and fact. This court applies a substantial competent evidence standard when reviewing the factual underpinnings of a trial court's decision to admit or suppress an eyewitness identification and applies a de novo standard to the ultimate legal decision drawn from those facts. *State v. Trammell*, 278 Kan. 265, 270, 92 P.3d 1101 (2004).

Courts apply a two-step procedure for analyzing whether an eyewitness identification should be excluded. First, the court determines whether the procedure used for making the identification was impermissibly suggestive. If so, the second step requires an analysis of whether the impermissibly suggestive procedure led to a substantial likelihood of misidentification. The court must consider the totality of the circumstances surrounding the identification, applying the factors set out in *State v. Hunt*, 275 Kan. 811,

817-18, 69 P.3d 571 (2003); and confirmed by *Trammell*, 278 Kan. at 270-71:

1. The witness' opportunity to view the criminal at the time of the crime;

2. The witness' degree of attention;

3. The accuracy of the witness' prior description;

4. The level of certainty demonstrated by the witness at the confrontation;

5. The length of time between the crime and the confrontation;

6. The witness' capacity to observe the event, including his or her mental and physical acuity;

7. The spontaneity and consistency of the witness' identification and the susceptibility to suggestion; and

8. The nature of the event being observed and the likelihood that the witness would perceive, remember, and relate it correctly.

The critical element of the analysis is the reliability of the identification. *Manson v. Brathwaite*, 432 U.S. 98, 53 L. Ed. 2d 140, 97 S. Ct. 2243 (1977). If the identification bears some indicia of reliability and there is not a substantial likelihood of irreparable misidentification, the jury must decide whether the evidence is reliable enough to support the defendant's conviction. 432 U.S. at 116. The *Brathwaite* Court stated:

"We are content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." 432 U.S. at 116.

Identification procedures are impermissibly suggestive if the officers conducting the proceeding give the witness information that highlights one of the individuals before the selection is made or make suggestions about who the witness should select. "A photographic lineup is impermissibly suggestive if the photographs do not depict individuals who generally fit within the witness' description or if there is a gross disparity between the defendant's photograph and the remaining photographs." *Trammell*, 278 Kan. at 273.

Notably, Corbett does not attack either the first or second photographic arrays shown to Williams and Miller or the procedure for showing them those arrays. Generally, if the procedure used for making the identification is not impermissibly suggestive, the analysis regarding the admissibility of the eyewitness testimony is complete. See *Trammell*, 278 Kan. at 270-71 (making the second step of the analysis dependent on finding that the procedure was unduly suggestive). However, because both Williams and Miller identified Shane in the first photographic lineup and because the preliminary hearing judge found their testimony to be unreliable, we must consider the *Hunt* factors to determine whether Williams' and Miller's identifications were admissible as a matter of law.

In our analysis of this issue we note our previous holdings which conclude that juries have the knowledge and experience to determine the reliability of an eyewitness identification. See *State v. Gaines*, 260 Kan. 752, 763, 926 P.2d 641 (1996); *State v. Wheaton*, 240 Kan. 345, 353, 729 P.2d 1183 (1986); *State v. Warren*, 230 Kan. 385, 395, 635 P.2d 1236 (1981). However, the jury should be instructed on the factors to consider in determining the reliability of an eyewitnesses identification. *Warren*, 230 Kan. at 395. When such an instruction is coupled with "vigorous cross-examination and persuasive argument by defense counsel dealing realistically with the shortcomings and trouble spots of the identification process," the defendant's rights are protected. *Warren*, 230 Kan. at 395.

After thoroughly reviewing the extensive record before us in this case, we find that Williams' and Miller's identifications are supported by substantial competent evidence and both bear an indicia of reliability. Both eyewitnesses were vigorously challenged on cross-examination, and the trial court instructed the jury regarding the factors it should use in considering Williams' and Miller's identifications. We believe the jury had the knowledge and experience necessary to evaluate and weigh the eyewitness identifications and determine their reliability. We conclude that the trial court did not err when it permitted Williams and Miller to testify regarding their eyewitness identifications.

## Eyewitness Cross-Examination

Next, Corbett claims that the trial court improperly limited his cross-examination of eyewitness Bryan Miller. Corbett's defense counsel attempted to question Miller regarding Miller's drug usage, and the following colloquy occurred:

"Q. Now, you then called—well, incidentally, have you ever been involved with drugs or marijuana?

"A. Yes, sir.

"Q. Have you had a conversation with [the assistant district attorney] about your involvement in drugs of marijuana?

"A. No, sir, not that I recall, no.

"Q. You never talked to [the assistant district attorney]?

"A. No, sir. He all—only thing—same questions you're asking me about the incident with Officer Rayburn. [Note this incident does not involve any drug charges against Miller. Rather it involves the first time Detective Rayburn showed Miller a photographic lineup containing Shane Casey's picture. Detective Rayburn accused Miller of being high and told him to come to the police station another day to make an identification.]

"Q. Well, are you presently charged in the District Court of Reno County, Kansas with drug charges?"

Before Miller could respond, the State objected. In response to the State's objection, Corbett's defense counsel stated: "Well, Your Honor, it certainly goes to his credibility . . . . In fact, he is charged with drug offenses in the District Court of Reno County, Kansas."

The trial court sustained the objection, struck Corbett's defense counsel's remark, and instructed the jury to disregard it. Corbett's defense counsel proffered that he was attempting to elicit evidence that the assistant district attorney had made a deal with Miller regarding his testimony in this case and the favorable effect it would have on pending criminal charges against him. Corbett claims that he was denied a fair trial because he was not permitted to establish Miller's bias.

The scope of cross-examination is subject to reasonable control by the trial court. *State v. Atkinson*, 276 Kan. 920, 925, 80 P.3d 1143 (2003) (reversing defendant's conviction for rape because the trial court limited the defendant's cross-examination of the complaining witness). The trial court's decision to limit cross-exami-

nation is reviewed using an abuse of discretion standard. Judicial discretion is abused when no reasonable person would adopt the trial court's view. *Atkinson*, 276 Kan. at 925.

Corbett's claim is not supported by Miller's testimony. Miller denied talking to the assistant district attorney about his involvement with marijuana. Miller acknowledged that he and the assistant district attorney had discussed Detective Rayburn's accusation that Miller had been smoking marijuana when Detective Rayburn showed Miller the first photographic lineup with Shane Casey's picture. However, Miller clearly indicated that he had not talked to the assistant district attorney about any other incidents regarding drugs. Corbett did not offer any evidence to contest Miller's negative response. Thus, the record does not support the inference that Miller was biased because he and the assistant district attorney had a deal to reduce Miller's alleged drug charges in exchange for Miller's favorable testimony. The trial court did not abuse its discretion when it limited Corbett's cross-examination of Miller.

## Decedent's Hearsay Statements

Corbett claims that the trial court improperly admitted hearsay statements made by Crystal prior to her death, including Crystal's diary. Corbett admits that he did not object to the admission of this evidence but argues that he should be permitted to raise the issue on appeal because *Crawford v. Washington*, 541 U.S. 36, 158 L. Ed. 2d 177, 124 S. Ct. 1354 (2004), changed the law regarding the admission of hearsay statements and should be applied retroactively to his case.

In *Crawford*, the United States Supreme Court established a new analysis for Confrontation Clause claims regarding the admission of hearsay evidence. Under the new analysis, the first step is to determine whether the statement is testimonial. Testimonial statements include, at a minimum, prior testimony and police interrogations. If the statement is testimonial, it may only be admitted if the declarant is unavailable and the defendant has had a prior opportunity to cross-examine the declarant. If the statement is not testimonial, the hearsay issue is analyzed using the applicable hear-

say law. *State v. Jackson*, 280 Kan. 16, 35, 118 P.3d 1238 (2005) (citing *Crawford*, 541 U.S. at 59, 68).

Crystal's statements and her diary are not testimonial. Thus, the law applicable to her statements is the hearsay statute found at K.S.A. 60-460. This law has not been amended since 1997. See K.S.A. 60-460. Corbett cannot claim any change in the intervening law as a basis to avoid K.S.A. 60-404, which requires the opponent of evidence to make a timely and specific objection to the admission of the evidence. Without such an objection, the issue is not preserved on appeal. *State v. Kaesontae*, 260 Kan. 386, 392, 920 P.2d 959 (1996) (refusing to review admission of 911 tape made by a nontestifying witness to the crime and a transcript thereof because the defendant did not object to the admission of the evidence). Corbett failed to object and preserve this issue for appeal.

## Sufficiency of the Evidence

Corbett argues that his conviction must be reversed because it is based on insufficient evidence. When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in a light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *Jackson*, 280 Kan. at 39.

Corbett argues that there is no direct evidence placing him inside Crystal's apartment at the time of her death. Direct evidence is " '[e]vidence in form of testimony from a witness who actually saw, heard or touched the subject of questioning. [Citation omitted.] Evidence, which if believed, proves existence of fact in issue without inference or presumption.' " *State v. Evans*, 275 Kan. 95, 105, 62 P.3d 220 (2003) (quoting Black's Law Dictionary 460 [6th ed. 1990]). However, a conviction for the gravest crime may be sustained by circumstantial evidence, which is any evidence that " 'tends to prove a fact in issue by proving other events or circumstances which afford a basis for a reasonable inference by the jury of the occurrence of the fact in issue.' " 275 Kan. at 105.

Although there is no direct evidence that Corbett was in Crystal's apartment at the time of Crystal's death, there is circumstantial

evidence supporting the inference that he was present and committed the murder. Two eyewitnesses testified that they saw Corbett outside Crystal's apartment during the period in which her murder occurred. One of the eyewitnesses personally knew Corbett prior to identifying him and identified him by name to several people, including the police, the morning Crystal's body was found. Photographs of Corbett taken within a few days of the murder demonstrate that his appearance matched the eyewitnesses' description of the man seen outside Crystal's apartment.

In addition to the eyewitness testimony, there was physical evidence linking Corbett to the scene of Crystal's murder. Police found Corbett's thumb print on the peephole in Crystal's front door. A DNA expert testified that Corbett's DNA could not be excluded as a contributor to the DNA found under Crystal's fingernails and that 1 in 52,000 Caucasians would have the same partial DNA profile as Corbett. This evidence is particularly prejudicial to Corbett when considered in light of the fact that there was no DNA from Crystal's 7-month-old son under Crystal's fingernails, and Crystal had been changing her son's diapers.

Finally, Corbett's possession of Crystal's personal property implies that he was present at Crystal's apartment the night she was murdered. Corbett had hidden a chest with some of Crystal's jewelry, jewelry boxes, and a key to Crystal's sister's home at his brother's house in Great Bend to prevent police from finding it. All of these items were known to be in Crystal's possession shortly before Crystal died, and there was evidence presented that Crystal would not have given those personal items to Corbett.

In addition to asking this court to overlook circumstantial evidence, Corbett asks this court to reweigh the evidence and reevaluate the credibility of the witnesses. However, that is not an appellate court's function. The jury is charged with the responsibility of weighing the evidence and determining witness credibility. Appellate courts do not reweigh the evidence or decide which witnesses are credible. *Jackson*, 280 Kan. at 39-40.

When the evidence is viewed in a light most favorable to the State, there is sufficient circumstantial evidence to support Corbett's conviction. Corbett's argument that there must be direct ev-

idence and his assertion that this court should reweigh the evidence and reevaluate the witnesses' credibility are without merit.

## Prosecutorial Misconduct

Corbett asserts that the prosecutor's closing arguments denied him a fair trial. Corbett raises three objections to the prosecutor's closing argument. First, Corbett claims the State argued facts not in evidence. Second, he claims the State's argument puts the jury in the place of the victim to inflame the passions or prejudices of the jury. Lastly, Corbett argues the use of the phrases "we know" or "I/we submit" to strengthen the State's case by injecting the prosecutor's personal opinion about the case.

If a prosecutor's statements violate the defendant's right to a fair trial and deny the defendant's Fourteenth Amendment right to due process, this court can find reversible error despite the lack of a contemporaneous objection. *State v. Betts*, 272 Kan. 369, 384-85, 33 P.3d 575 (2001).

"When reviewing an allegation of prosecutorial misconduct, an appellate court applies a two-step analysis to determine whether a prosecutor's comments have denied a defendant his or her constitutional right to a fair trial. First, the court must determine whether the remarks were outside the considerable latitude that the prosecutor is allowed in commenting on the evidence. Second, the court must decide whether the comments were so gross and flagrant as to prejudice the jury against the defendant and deny him or her a fair trial, thereby constituting plain error requiring reversal." *State v. Harris*, 279 Kan. 163, 173, 105 P.3d 1258 (2005).

In determining whether the comments denied the defendant his or her right to a fair trial, the court must consider the following three factors:

"(1) whether the misconduct is so gross and flagrant as to deny the accused a fair trial; (2) whether the remarks show ill will on the prosecutor's part; and (3) whether the evidence against the defendant is of such a direct and overwhelming nature that the misconduct would likely have little weight in the minds of the jurors." *State v. Elnicki*, 279 Kan. 47, 64-65, 105 P.3d 1222 (2005).

Corbett's first objection to the prosecutor's closing argument involves arguing facts not in evidence. As a fundamental rule of closing arguments, prosecutors must confine their remarks to matters in evidence. Commenting on facts not in evidence is clearly

improper. However, a prosecutor may draw reasonable inferences from the evidence and is allowed considerable latitude in discussing the evidence. *State v. Carter*, 278 Kan. 74, 80, 91 P.3d 1162 (2004).

During closing argument, the prosecutor stated that it must have broken Corbett's heart to have Emily call another man "Daddy." Corbett argues that there was no evidence to support that statement, and we find that the record does not support the prosecutor's inference that Emily called anyone "Daddy." Accordingly, we find that the prosecutor's comment was outside the facts in evidence and, therefore, improper. Nevertheless, we conclude that the comment does not constitute plain error. The comment is not so gross and flagrant as to deny Corbett a fair trial. The comment was brief in the context of over 1,600 pages of testimony and argument, and the State did not rely on that inference as a significant part of its case. See *State v. Ly*, 277 Kan. 386, 394, 85 P.3d 1200 (2004) (holding that prosecutor's misstatement of fact in the closing argument was not gross and flagrant because it was an insignificant part of the State's case); *State v. Gardner*, 264 Kan. 95, 106, 955 P.2d 1199 (1998) (concluding that improper closing remark regarding the location of key evidence was harmless error because the misstatement was made in passing and was not a significant part of the State's case). The State's theory was that Corbett killed Crystal to keep Emily with him and prevent Emily from moving to Wichita. This theory was not dependent on Emily calling another man "Daddy."

Corbett also argues that the prosecutor improperly implied that Corbett covered the peephole in Crystal's door, so Crystal would not see the "rage on his face." We conclude that this statement is a reasonable inference supported by evidence in the record. Crystal always kept her door locked and checked the peephole before opening the door. Corbett's thumbprint was on the peephole. Corbett was upset about Crystal moving to Wichita with Emily. When Corbett was angry, he turned bright red and gritted his teeth. These facts support the prosecutor's inference that Corbett covered the peephole to prevent Crystal from seeing the anger in his face.

Corbett's next objection to the prosecutor's closing argument involves statements that he claims inflamed the jury by putting it in the place of the victim. This type of argument is referred to as a "golden rule" argument. "Golden rule" arguments are generally improper because they encourage the jury to decide the case based on personal interest or bias rather than neutrality. *State v. McHenry*, 276 Kan. 513, 523, 78 P.3d 403 (2003). Prosecutors should not make statements that inflame the passions or prejudices of the jury or distract the jury from its duty to make decisions based on the evidence and the controlling law. *State v. Tosh*, 278 Kan. 83, 90, 91 P.3d 1204 (2004).

Although Corbett did not object at trial, Corbett now argues that the prosecutor's 4 minutes of demonstrative silence placed the jurors in the place of the victim and inflamed the jury's passion or prejudice. Corbett, however, fails to argue how the prosecutor's argument placed the jury in the position of the victim. The 4 minutes of silence was in the context of the prosecutor's argument regarding premeditation, not an appeal to the jury about how Crystal suffered. The prosecutor stated:

"The issue of premeditation is something that is extremely important in this case. We can establish from the facts—we can find that before he went there, he formulated a plan to kill her. Likewise before he actually killed her, he had his hands around her neck for four minutes—for four minutes with her unconscious and not moving, he has his hands around her throat for four minutes. . . .

(Silence for four minutes.)

". . . And it could have been ten, or longer. During that time you find that the defendant had an opportunity to reflect on what he was doing—to deliberate on what he was doing because if he had released his hands in that period of time, Crystal Casey would not be dead. It was an intentional act after a brutal beating. And he had every opportunity to think about it."

There are no Kansas cases addressing the use of a demonstrative silence during closing argument. However, three cases from North Carolina have addressed the use of a demonstrative silence during the penalty phase of the defendant's trial. *State v. Walls*, 342 N.C. 1, 462-63 S.E.2d 738 (1995) (upholding a 4-minute demonstrative silence to show how long the victim lay drowning at the bottom of

a river); *State v. Alston*, 341 N.C. 198, 248-49, 461 S.E.2d 687 (1995) (upholding a 3-minute silence to demonstrate how long it took to asphyxiate the victim with a pillow); and *State v. Artis*, 325 N.C. 278, 384 S.E.2d 470 (1989), *vacated on other grounds* 494 U.S. 1023, 108 L. Ed. 2d 604, 110 S. Ct. 1466 (1990).

In *Artis*, the defendant was convicted of first-degree murder and sentenced to death for manually strangling a woman. During closing arguments in the penalty phase of the trial, the prosecutor forewarned the jurors that he would take a 4-minute pause and stated:

"[H]old your breath just as long as you can. I'm not asking you to place yourself in the position of [the victim]. . . . [B]ut I want you to understand . . . the dynamics of manual strangulation, and I want you to understand just how long four minutes is in the that context. . . . [W]hile we are counting all four minutes, I want you to analyze in your mind the evidence that you have seen in this case. I want you to think about it. I want you to think about the helplessness of [the victim] there in those woods, confronted by this large man. I want you to think about the fear that she must have experienced. I want you to think about the brutal strength that he brought to bear on her body as he knocked her around and got her on the ground and choked her and raped her. And I want you to think about the surroundings she was in. I want you to think about the beauty of that place as she lie [*sic*] there dying, helpless, because this man, sitting at the next table, was determined to vent his lust on her body at any cost and any hazard to her. I want you to think about the loneliness of death. Her [*sic*] alone in the woods, hit in the head once, hit in the head twice, hit in the head three times; her cries going across those tree tops, 'Help, help, help,' and no one came. And I want you to think about, Ladies and Gentlemen of the Jury, as your air starts to run out, the testimony that she (indicating) tried to bring that most precious thing into her body and was unable to do it, because this man, sitting here, had her by the throat and was slowly murdering her. And I want you to think, also, Ladies and Gentlemen of the Jury, about the pain as described by the doctor; pain in the neck, the fluid filling the lungs." *Artis*, 325 N.C. at 323-24.

The *Artis* court held that the prosecutor's comments were not improper or prejudicial, relying on the distinction between the guilt phase and the penalty phase of the defendant's trial. The *Artis* court noted that while such arguments may have been prejudicial during the guilt phase of the trial, the prosecutor is allowed to emphasize the circumstances of the crime and the character of the defendant during the penalty phase, and the prosecutor's comments fell within that category. 325 N.C. at 324.

Clearly, *Artis*, *Alston*, and *Walls* can be procedurally distinguished from this case because the prosecutor's comments in this case occurred during the guilt phase of the trial rather than the sentencing phase. However, the prosecutor's comments in *Artis* demonstrate how the prosecutor could have used the silence to put the jury in the position of the victim. The prosecutor in this case did not go that far. Demonstrating the length of time that Corbett's hands were on Crystal's neck shows how long he had to think about what he was doing, which applies to premeditation, not Crystal's suffering. The prosecutor did not argue that Crystal was suffering during that 4-minute period. Accordingly, we conclude that the prosecutor's demonstrative silence did not place the jurors in Crystal's position and did not appeal to their biases, passions, or prejudices. We find no merit in Corbett's general claim that a prosecutor may not use a demonstrative silence.

In his final objection to the prosecutor's closing argument, Corbett claims that the prosecutor injected his own opinion regarding the evidence in the case. Prosecutors must not state a personal opinion regarding the ultimate guilt or innocence of the defendant. The reason for prohibiting prosecutors from commenting on their opinion of the defendant's guilt is that such expressions of personal opinion are a form of unsworn, unchecked testimony, not commentary on the evidence of the case. *McHenry*, 276 Kan. at 523-24.

Corbett argues that the prosecutor injected his opinion by using the phrases "we know" or "I/we submit." Besides highlighting the prosecutor's use of these phrases, Corbett raises no argument and cites no authority to support his claim that the prosecutor committed misconduct. Simply pressing a point without any supporting authority is akin to failing to brief an issue. When an appellant fails to brief an issue, the issue is waived or abandoned. *State v. Gleason*, 277 Kan. 624, 655, 88 P.3d 218 (2004).

Nevertheless, we find no merit in Corbett's claim. Each of the times the prosecutor used the phrase "we know," he was talking about uncontroverted evidence. The phrase "we know" does not indicate his personal opinion, but demonstrates that the evidence was uncontroverted. Thus, the use of the phrase "we know" under

these facts is not improper. Likewise, each of the times the prosecutor used the phrase "I/we submit," he used the phrase to advance an idea for the jury's consideration rather than expressing a personal opinion. Thus, the prosecutor's use of the phrase "I/we submit" was not improper.

Corbett further complains that the prosecutor improperly expressed his opinion when he stated that "[t]here may be weaknesses and uncertain pieces, but taken as a whole, *this is a very strong first-degree murder case.*" (Emphasis added.) Corbett did not object to the prosecutor's comment. We note that it was improper for the prosecutor to state his opinion regarding the strength of his case. However, we conclude that the statement is not plain error. The prosecutor did not repeat this statement to the jury. Moreover, the jurors were instructed that "[s]tatements, arguments and remarks of counsel are intended to help you in understanding the evidence and in applying the law, but they are not evidence. You should disregard any attorney's statement that has no basis in the evidence." Even without the prosecutor's statement, the jury could have assumed that the prosecutor believed the State had a strong case or the matter would not have been tried.

None of the prosecutor's comments during closing argument amounted to plain error requiring the reversal of Corbett's conviction.

## Admission of Evidence

For his final claim, Corbett asserts three errors in which the trial court improperly admitted evidence. The first concerns the admission of opinion evidence regarding the length of time force must be applied to cause death by manual strangulation, the second involves opinion evidence establishing Crystal's cause of death, and the third relates to the admission of hearsay statements from Corbett's former cellmate.

The admission of evidence is first reviewed for relevance. If the evidence has any tendency in reason to prove any material fact, the court must determine whether the evidentiary rules have been properly applied either as a matter of law or in the exercise of the

district court's discretion, depending on the evidentiary rule. See K.S.A. 60-401(b); *State v. Carter*, 278 Kan. 74, 77, 91 P.3d 1162 (2004).

For his first evidentiary error, Corbett specifically argues that the prosecutor improperly asked Dr. Oeberst, the deputy coroner, hypothetical questions regarding the length of time necessary to cause death by manual strangulation. This evidence was relevant to support the State's theory of premeditation and to establish the intentional act that Corbett committed to cause Crystal's death. Corbett asserts that the prosecutor's hypothetical questions must be limited to facts in evidence.

K.S.A. 60-456(b) provides:

"If the witness is testifying as an expert, testimony of the witness in the form of opinions or inferences is limited to such opinions as the judge finds are (1) based on facts or data perceived by or personally known or made known to the witness at the hearing and (2) within the scope of the special knowledge, skill, experience or training possessed by the witness."

K.S.A. 60-458 provides:

"Questions calling for the opinion of an expert witness need not be hypothetical in form unless the judge in his or her discretion so requires, but the witness may state his or her opinion and reasons therefor without first specifying data on which it is based as an hypothesis or otherwise; but upon cross-examination the witness may be required to specify such data."

The qualifications of an expert witness and the admissibility of his or her testimony are determined by the trial court in its exercise of discretion. The admission of such evidence is reviewed using an abuse of discretion standard. *State v. Strauch*, 239 Kan. 203, 214-15, 718 P.2d 613 (1986).

Dr. Oeberst testified that she knew of published medical literature on the subject of strangulation and had discussed the subject with other forensic pathologists, indicating that her opinion was based on facts that she personally knew. In addition, Dr. Oeberst performed the autopsy on Crystal's body and personally knew the condition of Crystal's body and had determined the cause of Crystal's death. As a board certified anatomic, clinical, and forensic pathologist, Dr. Oeberst was expressing an opinion based on her knowledge, skill, experience, and training. Thus, the trial court did

not abuse its discretion by admitting Dr. Oeberst's opinion regarding the length of time necessary to kill someone by manual strangulation.

For his second claim of error, Corbett complains that the trial court improperly admitted Dr. Oeberst's opinion regarding the cause of Crystal's death because the prosecutor failed to include the magic words "to a reasonable medical probability" in his question, and Dr. Oeberst failed to include the same magic words in her response.

The cause of Crystal's death is relevant to establish that her death was a homicide rather than an accident. The evidence is also relevant to prove that Corbett had to perform intentional acts to cause Crystal's death and to establish the nature of Corbett's intentional acts.

Corbett fails to cite any authority for the proposition that the question or answer must contain these magic words. Neither K.S.A. 60-456 nor K.S.A. 60-458 requires any specific form of questioning for an expert's opinion. In *State v. White*, 279 Kan. 326, 341, 109 P.3d 1199 (2005), we specifically noted that " 'magic words' or 'particular words of art' are not necessary in an expert's medical opinion so long as the appropriate standard is met." Corbett does not claim that Dr. Oeberst was not qualified to determine Crystal's cause of death. Rather his argument is limited to the use of magic words to give her opinion. Consequently, we conclude that the trial court did not abuse its discretion by admitting Dr. Oeberst's opinion regarding Crystal's cause of death.

Finally, Corbett asserts that the trial court improperly admitted hearsay statements from his former Reno County jail cellmate, Jeremy Murphy. Murphy testified about statements Corbett made to him regarding what happened at Crystal's apartment. According to Murphy, Corbett told him that he had gotten into a fight with his former wife over some derogatory remarks in her diary. During the course of the fight, she fell down the stairs. Because there were two children in the house, Corbett did not call the police. Corbett did not object to these statements. However, Corbett objected to the State's inquiry about whether Murphy had been warned by other inmates about repeating Corbett's story to authorities. The

trial court overruled Corbett's objection and admitted the warning as a "spontaneous remark."

Murphy's testimony about being warned by other cellmates is relevant to show that Murphy was not biased. Murphy was not testifying to improve the conditions of his confinement. Rather, Murphy's testimony was actually detrimental to his prison life because it caused him problems with his cellmates.

The admission of hearsay is governed by K.S.A. 60-460, which defines hearsay as "a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated." The State sought to admit evidence of an out-of-court statement offered to prove the truth of the matter asserted, that Murphy had been warned not to tell Corbett's story to the police. We disagree with the trial court's characterization of the testimony as a spontaneous remark exception to the hearsay rule and find no other applicable exception. However, we find any error in admitting the statement to be harmless. Murphy testified, without objection, that he had been confronted by other cellmates because he had repeated Corbett's story to the police. As a result, the other cellmates struck Murphy three times, causing a black eye and a bruised lip. Murphy also testified, without objection, that he was concerned about testifying because he was "probably going to take another good whooping." This testimony established the same evidence that the trial court admitted over Corbett's objection.

Affirmed.