NOT DESIGNATED FOR PUBLICATION

No. 118,100

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

TERRY ROWAN,
*Appellant*.


MEMORANDUM OPINION

Appeal from Wyandotte District Court; MICHAEL A. RUSSELL, judge. Opinion filed February 15, 2019. Affirmed.

*Clayton J. Perkins*, of Kansas Appellate Defender Office, for appellant.

*Nicholas Campbell*, assistant district attorney, *Mark A. Dupree Sr.*, district attorney, and *Derek Schmidt*, attorney general, for appellee.


Before STANDRIDGE, P.J., PIERRON and GREEN, JJ.


PER CURIAM: Following a trial, Terry Rowan was convicted of two counts of distribution of marijuana and one count of possession of marijuana. Rowan now appeals those convictions claiming that the State presented insufficient evidence to rebut his entrapment defense and, alternatively, that the State committed prosecutorial error during closing argument. Finding no reversible error, we affirm Rowan's convictions.

1

On December 27, 2013, Tina Johnson called Kansas City, Kansas, Police Officer Nathan Doleshal and informed him that she thought she could purchase marijuana from Rowan. At the time, Johnson was working with Doleshal as a confidential informant. In that role Johnson helped Doleshal to set up and carry out controlled, undercover drug buys. Johnson initially began working as a confidential informant in exchange for leniency on some criminal charges that she was facing. But after she had earned that leniency, Johnson continued to work as a confidential informant in exchange for monetary compensation, typically between $50 and $200 per buy. Johnson estimated that she had been a confidential informant for about six years and that she had been involved in well over 100 drug buys and investigations.

When Johnson called Officer Doleshal, she informed him that she had known Rowan for years and believed he could sell her a pound of marijuana. At the time, Rowan was living in a makeshift building located in the backyard of Kenneth Tomblin's home. Rowan had built the structure; it was essentially a single room that housed his kitchen, living, and dining areas as well as a lofted bed. Rowan made his living by collecting and recycling scrap metal from various businesses. Rowan was unable to drive because his driver's license was suspended. He therefore enlisted the help of Tomblin, and the two of them drove around collecting scrap metal and handling recycling jobs on a daily basis.

Prior to being contacted by Johnson, Officer Doleshal had no knowledge of or experience with Rowan. By contrast, his partner, Officer Jeffrey Miskec had crossed paths with Rowan on five or six different occasions, all of which involved traffic violations and/or Rowan's suspended license. And in none of those interactions did Miskec suspect that Rowan was involved in the sale or distribution of drugs. Indeed, Miskec had conducted multiple inventory searches of Rowan's vehicle but never found any drugs, paraphernalia, or other evidence indicating that Rowan was involved in

2

narcotics. Based on that history, Miskec expressed a degree of skepticism regarding the accuracy of Johnson's claim that she could purchase a pound of marijuana from Rowan. Despite Miskec's misgivings, Doleshal did nothing to verify or confirm Johnson's information. Instead, he simply passed it along to his supervisor. Doleshal ultimately received authorization to proceed with the investigation and to "use Ms. Johnson to purchase marijuana from Mr. Rowan."

After receiving authorization, Johnson made a number of phone calls to Rowan to set up the sale. These calls were made while Johnson was sitting next to Officer Doleshal. While Doleshal was able to hear a majority of what was said and to follow both sides of the conversation, he was not able to record the phone calls. During those phone calls, Rowan reportedly told Johnson that she could come by later that day—December 27, 2013—to carry out the previously agreed upon sale. Pursuant to the protocol for controlled drug buys, Officers Doleshal and Miskec searched Johnson for contraband, weapons, and money immediately before the planned transaction. Finding none, the officers provided Johnson with $160 in prerecorded bills, with which she was to purchase the drugs. The officers also outfitted Johnson with a discrete electronic recording device. That device allowed the audio feed to be monitored in real time and also recorded both audio and video so it could be reviewed later.

After Johnson was properly searched and outfitted, the officers dropped her off in an alleyway next to Rowan's house. Johnson then called Rowan, who let her in through a backyard gate and invited her into his home. Once inside, Johnson told Rowan what she wanted, watched him weigh the requested amount of marijuana on a small scale, and then gave Rowan the $160 in prerecorded bills in exchange for that marijuana. After the sale was complete, Johnson returned to the alleyway and handed the marijuana over to the officers waiting in their vehicle. The entire process lasted no more than a few minutes. Back at the police station, Officer Miskec conducted a field test of the marijuana purchase, which revealed a positive result for the presumptive presence of THC. That

3

finding was later confirmed by a lab test, which also showed that the total weight of the marijuana from this first controlled buy was approximately 52 grams.

A week later, on January 2, 2014, a second controlled buy was conducted. Using the exact same procedure, Johnson was able to purchase an additional $220 worth of marijuana from Rowan. Officer Miskec again conducted a field test that returned a positive result for the presumptive presence of THC. Lab testing later confirmed that finding and also showed that the total weight from the second controlled buy was approximately 50 grams.

During the second controlled buy, Johnson reportedly asked Rowan if she could purchase a pound of marijuana from him. Rowan responded that he did not have that amount but allegedly said he could get it for her if she gave him the money up front "or something to that effect."

Based on those two controlled buys and the tentative plan for Rowan to sell Johnson a pound of marijuana, Officer Doleshal applied for a warrant to search Rowan's residence. That warrant was approved on the afternoon of January 2, 2014, but Doleshal delayed the execution of the warrant while he waited for confirmation that the marijuana was at Rowan's residence. He eventually received that confirmation, and the search warrant was executed on the evening of January 3, 2014. Doleshal was off duty at the time; therefore, the search was conducted by Officer Miskec along with the department's tactical unit. The search resulted in the recovery of 10 grams of marijuana, a scale, plastic baggies, and some pipes.

Following the search, Rowan was arrested and charged with two counts of distribution of marijuana. After a preliminary hearing, the Information was amended to include a count for the possession of marijuana as well a count for the possession of drug paraphernalia. The case proceeded to trial. Rowan did not dispute that he sold marijuana

to Johnson on both December 27, 2013, and January 2, 2014. Instead, he argued that he was entrapped by Johnson. Rowan testified that Johnson approached him six months before the first controlled buy and asked him to sell her some marijuana. He refused to do so and reportedly told her that he was not a drug dealer. When Johnson approached him a second time in December 2013, she allegedly told him that she needed the marijuana for her son who was sick with cancer. Rowan did not have any marijuana in his possession at the time but agreed to try and find her some because her son was sick. After two days of searching, Rowan testified that he called Johnson to let her know that he finally had found some marijuana. Rowan advised Johnson that he could only find a small amount, not the pound that she was looking for. That marijuana was sold to Johnson during the controlled buys outlined above. At the end of his testimony, Rowan reiterated that he was not a drug dealer and that he would not have sold Johnson the marijuana if she had not told him that she needed it for someone who was sick.

Johnson also testified at the trial. While she confirmed a large portion of Rowan's testimony, she denied telling him that she needed the marijuana for someone who was undergoing chemotherapy. Instead, she testified that she told Rowan that she needed the marijuana for someone who was coming in from out-of-town.

Although not privy to every conversation between Johnson and Rowan, Officer Doleshal testified that Johnson had told Rowan that he—Doleshal—was her relative from out-of-town and that he wanted the marijuana to take back home with him. Doleshal said this was a common ruse that he and Johnson often used when setting up controlled buys. Doleshal also said that in all his years of working with Johnson, he had never heard her use any type of illness to explain why she wanted to buy drugs. Indeed, Doleshal went so far as to state that he would not tolerate Johnson using a fake illness as a motive for obtaining drugs because "it can be kind of misleading and maybe convince somebody to do something they normally wouldn't do."

At the end of the trial, the jury convicted Rowan on two counts of marijuana distribution and one count of possession of marijuana. The jury acquitted him, however, on one count of possession of drug paraphernalia. Rowan filed a motion for a new trial (based on different grounds than those raised on appeal) as well as a motion for a dispositional and durational departure. Both were denied, and Rowan was sentenced to 56 months in prison. Rowan timely appeals.

ANALYSIS

Rowan appeals from his convictions for distribution of marijuana on grounds that there is insufficient evidence to rebut his entrapment defense. Rowan also claims on appeal that the State committed prosecutorial error during closing argument. We address each of Rowan's claims in turn.

1. *Sufficiency of the evidence*

Rowan does not dispute that, in the absence of his affirmative defense of entrapment, the State presented sufficient evidence to support his convictions for distribution of marijuana. Instead, Rowan raised entrapment as an affirmative defense to the charges. In support of his claim of entrapment, Rowan argued that Johnson, acting as an agent of law enforcement, induced him to sell marijuana, a crime he was unlikely and disinclined to have committed in the absence of Johnson's solicitation.

In Kansas, the statute governing the defense of entrapment provides:

"A person is not guilty of a crime if such person's criminal conduct was induced or solicited by a public officer or such officer's agent for the purposes of obtaining evidence to prosecute such person, unless:

6

(a) The public officer or such officer's agent merely afforded an opportunity or facility for committing the crime in furtherance of a criminal purpose originated by such person or a co-conspirator; or

(b) The crime was of a type which is likely to occur and recur in the course of such person's business, and the public officer or such officer's agent in doing the inducing or soliciting did not mislead such person into believing such person's conduct to be lawful." K.S.A. 2017 Supp. 21-5208.

Because entrapment is an affirmative defense, a statutory burden-shifting scheme must be applied. A defendant claiming entrapment must first meet the burden to come forward with some competent evidence in support of the claim, and thereafter, "the state has the burden of disproving the defense beyond a reasonable doubt." K.S.A. 2017 Supp. 21-5108(c). Thus, when the State or its agent solicits a defendant to commit a crime, the State must prove beyond a reasonable doubt that the defendant was predisposed to commit that crime in order to rebut an entrapment defense. *State v. Reichenberger*, 209 Kan. 210, 217, 495 P.2d 919 (1972); see also K.S.A. 2017 Supp. 21-5108(c).

To determine whether the State has met its burden of proving predisposition beyond a reasonable doubt, the finder of fact must weigh the extent to which the government acted to solicit the crime charged against any evidence that the defendant was predisposed to committing the crime charged, including but not limited to the defendant's willingness and ready compliance with a request by the State's agent as well as a defendant's criminal history or prior suspicious conduct. *State v. Rogers*, 234 Kan. 629, 632, 675 P.2d 71 (1984); *Reichenberger*, 209 Kan. at 218. If the evidence is sufficient to prove beyond a reasonable doubt that the State or its agent merely afforded an opportunity for the defendant to commit an offense he or she already intended to commit, the State has met its burden. *State v. Jones*, 271 Kan. 201, 204, 21 P.3d 569 (2001).

7

Therefore, the issue presented for decision is whether the State presented sufficient evidence to rebut Rowan's entrapment defense.

> "'When sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after reviewing all the evidence in a light most favorable to the prosecution, the appellate court is convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt. Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations.' [Citation omitted.]" *State v. Chandler*, 307 Kan. 657, 668, 414 P.3d 713 (2018).

A verdict may be supported by circumstantial evidence if such evidence provides a basis for a reasonable inference by the fact-finder regarding the fact in issue. Circumstantial evidence, in order to be sufficient, need not exclude every other reasonable conclusion. *State v. Logsdon*, 304 Kan. 3, 25, 371 P.3d 836 (2016). Indeed, even the most serious offenses can be based entirely on circumstantial evidence. 304 Kan. at 25. But see *State v. Richardson*, 289 Kan. 118, 127, 209 P.3d 696 (2009) ("'[T]he circumstances in question must themselves be proved and cannot be inferred or presumed from other circumstances.'").

In this case, there was no evidence that Rowan had previous drug convictions or was ever suspected of being involved in the drug industry. There was evidence, however, to establish that Rowan was able to quickly comply with Johnson's request to buy marijuana on two separate occasions. A reasonable juror could conclude from this fact that Rowan was predisposed to distribute marijuana. And that conclusion is supported by evidence recovered during execution of the search warrant. This evidence included marijuana (albeit a small amount), a scale, and some plastic baggies, all of which are commonly used in the distribution of drugs. Finally, the video recordings of the transactions showed that, without any hesitation or uncertainty, Rowan knew how to weigh and package the marijuana and knew what price to expect when Johnson came over to make the purchase. In light of all this evidence, a rational juror reasonably could

8

conclude beyond a reasonable doubt that Johnson's request to buy marijuana from Rowan merely afforded an opportunity for Rowan to commit an offense he already intended to commit. See *Jones*, 271 Kan. at 204. And, in fact, that is precisely what the jury found.

Rowan disputes the jury's finding on two separate grounds. First, he argues that "there was no actual evidence of any distribution to anyone other than Johnson" and that the existing evidence only reinforces his claim of entrapment. Specifically, Rowan points to: (1) his own testimony that he is not a drug dealer, (2) Tomblin's testimony that he has never seen unusually high traffic or any other indication that Rowan was selling drugs out of his home, and (3) Officer Miskec's testimony that, based on his previous interactions with Rowan, he was skeptical of the idea that Rowan was selling drugs. But even if each of those claims are true, they simply confirm that there was no criminal history or prior suspicious conduct suggesting that Rowan was involved in drugs and do nothing to refute the evidence introduced at trial that supports the jury's decision finding Rowan was predisposed to distribute marijuana. Rowan's argument is really a request by Rowan for us to reweigh the evidence on appeal, which we cannot do. See *Chandler*, 307 Kan. at 668 (Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations.).

Similarly, Rowan's second argument—that the search of his home did not reveal further evidence of marijuana or evidence of distribution to anyone beyond Johnson— also lacks merit. While the officers who searched Rowan's home did not discover the pound of marijuana that Johnson claimed Rowan was prepared to sell her, it did result in the recovery of approximately 10 grams of marijuana, a scale, and plastic baggies. Rowan argues that this small amount of marijuana was for personal use, but when combined with the plastic baggies and the scale, and looking at the evidence in a light most favorable to the prosecution, it was enough for a jury to find beyond a reasonable doubt that Rowan was predisposed to sell marijuana to Johnson.

9

For the reasons stated above, we find the State submitted sufficient evidence at trial to prove beyond a reasonable doubt that Rowan was predisposed to commit the crime of marijuana distribution, which, in turn, successfully rebutted Rowan's entrapment defense.

2. *Closing argument*

In his second claim of error, Rowan argues the State committed reversible error during closing argument by offering personal opinions, commenting on facts not in evidence, and/or misstating the law and facts of the case.

To evaluate claims of prosecutorial error, appellate courts utilize a two-step process. *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016). First, the court must determine whether any prosecutorial error occurred by deciding "whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial." 305 Kan. at 109. If prosecutorial error is found, then second, the court must determine whether the error prejudiced the defendant's Fourteenth Amendment due process right to a fair trial. To evaluate prejudice, the court uses the traditional constitutional harmless error test, under which "prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.'" 305 Kan. at 109.

Rowan argues that the State committed three different types of prosecutorial error during its closing argument:  (a) offering personal opinions regarding the evidence, (b) commenting on facts not in evidence, and (c) misstating the law and facts of the case.

a. *Offering personal opinions*

Rowan's first claim of prosecutorial error is that the State improperly expressed its personal opinions regarding the evidence and the credibility of witnesses while presenting its closing argument to the jury.

A prosecutor is not permitted to offer his or her personal opinions regarding the evidence, the guilt or innocence of the defendant, or the credibility of witnesses. *State v. Charles*, 304 Kan. 158, 173, 372 P.3d 1109 (2016), *abrogated on different grounds by State v. Huey*, 306 Kan. 1005, 399 P.3d 211 (2017); *State v. Brown*, 300 Kan. 542, 560, 331 P.3d 781 (2014); *State v. Corbett*, 281 Kan. 294, 315, 130 P.3d 1179 (2006). This is for a number of reasons, first and foremost being that the prosecutor's personal opinions are simply irrelevant to the task before the jury. *Charles*, 304 Kan. at 173. Furthermore, "such expressions of personal opinion are a form of unsworn, unchecked testimony, not commentary on the evidence of the case." *Corbett*, 281 Kan. at 315. But while prosecutors are not permitted to offer their own personal opinions, they are permitted to advance an idea for the jury to consider and draw reasonable inferences from the evidence presented without it constituting an improper personal opinion. 281 Kan. at 312-16 (specifically holding that "the prosecutor used the phrase 'I/we submit' . . . to advance an idea for the jury's consideration rather than [to] express[] a personal opinion. Thus, the prosecutor's use of the phrase 'I/we submit' was not improper").

Here, Rowan claims that the State gave improper personal opinions at the following four points during its closing argument:

"Would a person who's never sold drugs before really be that concerned with weight, know what they're talking about, meaning exactly 28 grams? I submit they wouldn't. They wouldn't know.
"What does he also do? He takes the baggie, licks the baggie, and rolls it. Would a person who's never sold drugs know exactly how to wrap or the easiest way to seal a

11

bag of marijuana? I submit that he would not. In fact, he seemed to know what he was doing quite well.

. . . .

". . . At the end he says, 'I'll need 690.' But he knows how much a half pound costs. If someone who is just selling this one instance to sell the 2 ounces, how is he going to know all of a sudden that a half a pound is going to cost $650? He wouldn't. He wouldn't know unless he was in the business of being a drug dealer.

. . . .

". . . Johnson had known him for a long time and never brought it to the attention of the officers. Why? I submit to you that because she didn't know he was a drug dealer either at that time. But when was he a drug dealer? Back on December 27th, 2013, and January 2nd of 2014.

. . . .

"Also look at the credibility of the witnesses. [Defense counsel] wants you to believe that Mr. Tomblin didn't know he was dealing drugs, that it wasn't a drug house. I submit he was new to the game. Had just started. Also he didn't have to sell the drugs every single time in his home. There's no evidence of that, but he doesn't have to. Also the defendant has stated that he did—[.]"

Rowan argues each of these four statements constituted an attempt by the prosecutor to compare Rowan's actions with what, in the prosecutor's opinion, are the actions of a typical drug dealer. However, none of those statements are improper personal opinions. Instead, each is simply an invitation for the jury to consider an idea or to draw a reasonable inference from evidence that was presented at trial. See 281 Kan. at 312, 316. Specifically, that State invited the jury to: (1) look at the evidence that was presented regarding Rowan's actions (i.e., that he was able to weigh and package the marijuana as well as come up with an appropriate price); (2) draw reasonable inferences from that evidence (i.e., that Rowan in fact knew what he was doing and had likely done it before); and (3) consider the idea that Rowan may be an experienced drug dealer. We find none of the statements about which Rowan complains are improper personal opinions by the State constituting prosecutorial error.

12

b. *Commenting on facts not in evidence*

During trial, the State presented testimony from D.C. Broil, who was the director of the forensic laboratory at Kansas City, Kansas, Community College. As part of her duties at the lab, Broil is provided with substances from the police department and asked to test these substances to determine whether they are narcotics. While Broil was testifying, Rowan began to get emotional and upset, to the point that the court had to take a recess to allow Rowan a chance to calm down and compose himself. It is unclear from the record what sparked Rowan's emotional outburst. But regardless of its cause, the State referenced the incident during its closing argument, stating:

> "And the defendant reacted emotionally. It's—you might become emotional during this case. He did. When did he do so? When D.C. Broil testified, the very last witness called by the State. She was testifying to if the drugs tested positive. This was after Miss Johnson, Officer Doleshal . . . and Officer Miskec had all testified. Had the gauntlet of evidence laid against him before Miss Broil testified, he became emotional. Take that for what it's worth."

Rowan argues that it was inappropriate for the prosecutor to make reference in closing argument to his demeanor during trial because such a reference goes beyond the scope of the evidence presented at trial.

Kansas courts routinely hold "that it is improper for a prosecutor to comment on facts not in evidence, to divert the jury's attention from its role as factfinder, or to make comments that serve no purpose other than to inflame the passions and prejudices of the jury." *State v. Stimec*, 297 Kan. 126, 128, 298 P.3d 354 (2013). This prohibition extends not only to comments regarding facts not in evidence but also to comments that go beyond the scope of the evidence presented. *State v. Robinson*, 303 Kan. 11, 308, 363 P.3d 875 (2015), *disapproved on other grounds by State v. Cheever*, 306 Kan. 760, 402 P.3d 1126 (2017). It does not extend, however, to comments regarding matters that are

13

properly before the jury. *State v. Todd*, 299 Kan. 263, 283, 323 P.3d 829 (2014). "A jury is permitted to consider the demeanor of a witness, as well as his or her words. And a prosecutor may remind jurors about a witness' demeanor when the prosecutor is making a closing argument." 299 Kan. at 285-86; see also *State v. Scaife*, 286 Kan. 614, 624, 186 P.3d 755 (2008).

In support of prosecutorial error, Rowan points to the Supreme Court's opinion in *Robinson*. In that case, the prosecutor made a comment during the penalty phase of a capital case. The comment noted that the defendant cried one time during trial. The court held that a prosecutor's comments regarding the defendant's demeanor during trial went beyond the scope of the penalty phase evidence and "appear[ed] to serve no legitimate purpose other than to inflame the passions or prejudices of the jurors and divert their attention from the task at hand." 303 Kan. at 308. Although the prosecutor's comment in *Robinson* was made in the closing argument during the penalty phase of a capital case, we find that fact indistinguishable to the holding of the case: that a prosecutor's comments regarding the defendant's demeanor during trial went beyond the scope of the evidence and appeared to serve no legitimate purpose other than to inflame the passions or prejudices of the jurors and divert their attention from the task at hand.

With that said, the prosecutorial errors considered by our Supreme Court in *Todd* and *Scaife* are distinguishable. In both of those cases, the prosecutor made reference in closing argument to the demeanor of witnesses while they were on the witness stand testifying at trial. The prosecutor urged the jury to consider what the witnesses said and how they said it, i.e., their demeanor. One of the reasons that appellate courts do not assess witness credibility from the cold record is that the ability to observe the declarant is an important factor in determining whether he or she is being truthful. *Scaife*, 286 Kan. at 624. In both *Todd* and *Scaife*, the court held the prosecutor should be permitted to explain that facet of the credibility calculus to the jury.

In this case, however, the prosecutor commented on Rowan's demeanor while he was sitting at counsel's table. The prosecutor urged the jury to consider how emotional Rowan became when witness Broil laid "the gauntlet of evidence" against him. The prosecutor did not ask the jury to consider Rowan's demeanor in order to assess his credibility as a witness. And the prosecutor did not ask the jury to consider Rowan's demeanor as relevant evidence in the case. Instead, the prosecutor asked the jury to consider Rowan's demeanor at counsel's table as evidence of his guilt. As such, we find the prosecutor's comments regarding Rowan's demeanor during trial went beyond the scope of the evidence and served no legitimate purpose other than to inflame the passions or prejudices of the jurors and divert their attention from the task at hand. Thus, the State erred in drawing attention to the fact that Rowan became upset while Broil was testifying.

To determine whether the prosecutor's comment on Rowan's demeanor was harmless, we consider whether the State has demonstrated beyond a reasonable doubt that the error did not affect the outcome of the trial in light of the entire record. See *Sherman*, 305 Kan. at 109. Under this standard, we find the error harmless. The remark was brief and isolated. The remark drew no objection from the defense. Nor did the comment run afoul of any prior ruling of the district judge. Moreover, the district judge instructed the jury that arguments of counsel were not to be considered as evidence. In light of the totality of the circumstances, we find no reasonable possibility that the error contributed to the verdict.

c. *Misstatement of facts and law*

Rowan's third and final claim of prosecutorial error is that the State misstated the law and the facts of the case during its closing argument.

Prosecutors are granted considerable latitude to discuss the evidence and draw reasonable inferences when making their closing arguments. *State v. McCorkendale*, 267

15

Kan. 263, 275, 979 P.2d 1239 (1999). That considerable latitude does not, however, allow prosecutors to state facts that are not in evidence or misstate facts to the point that they are no longer supported by the evidence. *State v. Ly*, 277 Kan. 386, 393, 85 P.3d 1200 (2004). Prosecutors are similarly prohibited from misstating the law of the case, particularly where "the facts are such that the jury could have been confused or misled by the [mis]statement." *State v. Hall*, 292 Kan. 841, 849, 257 P.3d 272 (2011).

Here, Rowan first claims that the State misstated the law of entrapment during its closing argument. Specifically, Rowan points to the following exchange:

> "[Prosecutor:]  The State's not alleging that Mr. Rowan has been a drug dealer for twenty years, for any sort of time. We allege that on December 27th, 2013, and January 2nd, 2014, he was a drug dealer.
> "[Defense Counsel]:  Judge, I object. I believe that misstates the law as to—
> "THE COURT:  Overruled."

Rowan argues that this misstated the law of entrapment because it "indicated that the jury could convict based simply upon the State's evidence of the solicited distribution to Johnson on December 27th, 2013, and January 2nd, 2014." As noted above, however, nothing in the law of entrapment requires the State to prove that Rowan had a history of dealing drugs. See K.S.A. 2017 Supp. 21-5208; *Reichenberger*, 209 Kan. at 218 ("Uncensurable solicitation by an officer met with ready compliance by the actor is generally, if not universally, accepted as evidence of predisposition."). Instead, the State must simply prove beyond a reasonable doubt that its agent "merely afforded an opportunity or facility" for the defendant to commit the crime. K.S.A. 2017 Supp. 21-5208(a). We conclude the State did not misstate the law of entrapment during its closing argument. Because we have determined there was no prosecutorial error, there is no need for us to conduct a prejudice analysis.

16

But Rowan also claims that the State misstated the facts of the case when, during closing argument and in reference to Officer Miskec's interactions with Rowan, the prosecutor said: "He hadn't seen him in six or seven years. Been on the narcotics unit for two years." The State concedes that neither of these statements were supported by the evidence; therefore, we necessarily find that prosecutorial error occurred. Having found the State committed prosecutorial error during its closing argument, we move on to the second step of the analysis to determine whether the error prejudiced Rowan's constitutional due process right to a fair trial. See *Sherman*, 305 Kan. at 109. "[P]rosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.' [Citation omitted.]" 305 Kan. at 109. Remarks that are brief and isolated in nature bear little weight in the minds of jurors and consequently do little to affect the outcome of the trial or contribute to the verdict. See *Robinson*, 303 Kan. at 308-09.

Here, the State committed two prosecutorial errors during closing argument. First, the State claimed that Officer Miskec had not seen Rowan in six or seven years. This was a misstatement of fact as Miskec actually testified that he had not seen Rowan in three or four years. Second, the State claimed that Miskec had been on the narcotics unit for two years. This was another misstatement of fact as Miskec actually testified that he had been with narcotics for 19 months. Notwithstanding these misstatements of fact, we find no reasonable possibility that either of the misstatements contributed to the verdict. Both are minor discrepancies that largely can be attributed to basic rounding or, at worst, an unintentional and immaterial confusion of a few numbers. And despite Rowan's argument to the contrary, neither of the two misstatements were related to any of the core issues of fact or law at trial; instead, the misstatements constituted basic background facts about Miskec. Finally, the two misstatements comprised two lines of a closing argument in a three-day trial that was recorded in over 500 pages of transcript. They were therefore too brief and isolated to bear any weight in the minds of the jurors. See *Robinson*, 303 Kan.

17

at 309 (erroneous remarks bore little weight in minds of jurors because they "comprised a few lines of a closing argument in a multi-week trial recorded in thousands of pages of transcript"). For these reasons, we find the two misstatements, although error, were not reversible error as they did not prejudice Rowan's constitutional due process right to a fair trial.

Affirmed.