IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 121,269

STATE OF KANSAS,
*Appellee*,

v.

THOMAS EARL BROWN JR.,
*Appellant*.

SYLLABUS BY THE COURT

1.

Under K.S.A. 2021 Supp. 60-261 and K.S.A. 60-2105, a trial error is reversible only if it prejudices a defendant's substantial rights. The party benefitting from an error violating a statutory right has the burden to show there is not a reasonable probability that the error will or did affect the outcome of the trial in light of the entire record.

2.

Appellate courts use a two-step framework to analyze claims of prosecutorial error. First, the appellate court considers whether the prosecutor stepped outside the wide latitude prosecutors are given to conduct the State's case in a manner that does not offend a defendant's constitutional right to a fair trial. Second, if error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial, using the traditional constitutional harmlessness inquiry demanded by *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). Under this test, prosecutorial error is harmless if the State can show beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial given the entire record, that is, where there is no reasonable possibility that the error contributed to the verdict.

1

3.

The test for cumulative error is whether the errors substantially prejudiced the defendant and denied the defendant a fair trial given the totality of the circumstances. In making the assessment, an appellate court examines the errors in context, considers how the district court judge addressed the errors, reviews the nature and number of errors and whether they are connected, and weighs the strength of the evidence. If any of the errors being aggregated are constitutional, the constitutional harmless error test of *Chapman* applies, and the party benefitting from the errors must establish beyond a reasonable doubt that the cumulative effect of the errors did not affect the outcome.

Appeal from Shawnee District Court; DAVID DEBENHAM, judge. Opinion filed July 29, 2022. Affirmed.

*Nicholas David*, of The David Law Office LLC, of Lawrence, argued the cause and was on the brief for appellant.

*Jodi Litfin,* assistant solicitor general, argued the cause, and *Derek Schmidt*, attorney general, was with her on the brief for appellee.

The opinion of the court was delivered by

LUCKERT, C.J.:  After a jury convicted Thomas Brown Jr. of first-degree murder and other crimes, he directly appeals, raising three questions:

(1) Did the district court err in admitting a map depicting cell phone tower location data over his hearsay objection?

(2) Did the prosecutor engage in reversible error by making certain statements, including "we know" statements, during closing argument? and

(3) Did cumulative error deprive him of his right to a fair trial?

We presume error on the first issue and find prosecutorial error after analysis of the second issue. We also consider whether those errors individually or cumulatively require us to reverse Brown's conviction and conclude beyond a reasonable doubt the errors would not have affected the jury's verdict. We thus affirm Brown's convictions.

FACTS AND PROCEDURAL BACKGROUND

Hours after her marriage to Melvin Ray, Tiffany Davenport-Ray died from gunshot wounds. The shooting happened in the early morning hours as the couple left a postwedding party that they had hosted at the Topeka Elks Club. Ray drove Davenport-Ray's Dodge Charger. While waiting at a stop light, Ray noticed a white SUV behind them. The SUV followed the Charger and later pulled alongside it. Someone in the SUV fired shots into the Charger. Ray hit the brakes and returned fire. The SUV lost control and crashed. Ray then realized Davenport-Ray had been shot and drove to the hospital. An autopsy revealed Davenport-Ray died of a gunshot wound to the head.

Residents near the shooting and police officers patrolling nearby heard several gunshots. Officers immediately drove toward the sound. En route, they learned of an injury accident in the direction they were heading. Nearby residents heard the collision and went outside after the shots stopped. They reported observing two vehicles—one that looked like a Charger and another that was a white SUV. One witness told the officers she saw two people exit and flee the SUV, running toward a nearby auto shop. Her husband also saw two people run toward the auto shop and an adjacent fence and a short

3

time later saw the driver exit the vehicle and run. Another resident realized a bullet hit her home where she lived with her mother and sisters.

One officer who arrived on the scene saw a black male running from the scene. One of the residents identified the man as the driver of the SUV. An officer apprehended the SUV driver, later identified as Awnterio Lowery. Officers searched Lowery and took him to the Law Enforcement Center.

Other officers followed the trail of the two SUV passengers who ran toward the auto body shop. Along the way, they found fresh-looking latex gloves matching gloves found in the SUV. But they did not apprehend the two men. Over time, they developed leads that suggested Brown and Jermel Robbins were the two passengers.

Some leads were developed from forensic testing of evidence found at the scene. The police investigation of the scene revealed bullet holes in the passenger side of the SUV. Officers found a gun, latex gloves, and two cell phones in the SUV—an iPhone and a Samsung. Eventually the police tied Brown and Lowery to the phones, in part through DNA testing and through data stored on the phones.

The DNA testing did not exclude Brown as a contributor to DNA found on the Samsung phone. It also revealed he was a contributor to DNA found on other pieces of evidence, including the latex glove fragments found near the auto shop. The testing of the gloves revealed a major contributor whose profile was consistent with Brown's. Testing of DNA found on parts of the car revealed major contributors whose profiles were consistent with Robbins and Lowery. Brown's DNA was consistent with a minor contribution of DNA on the vehicle's airbag. The forensic scientist who performed the DNA testing testified that her laboratory does not provide identity statements. In other words, she would not say whether the DNA sample is a match but would instead state

4

whether test results excluded a particular individual and then provide a probability for those individuals not excluded. The probability figures associated with evidence tend to reveal a low probability that anyone other than Lowery, Robbins, or Brown could have been the source of DNA found on one or more items of evidence. In other words, each was identified as a major contributor to DNA found on evidence.

The police also obtained the phone records of the iPhone and Samsung found in the SUV. Investigators determined the iPhone belonged to Lowery and Brown had used the Samsung. They learned that Dina Sanchez bought a phone for Brown to use, but it was not a Samsung. But the phone number assigned to the phone Sanchez gave Brown was later assigned to the Samsung found in the SUV. Sanchez testified Brown paid the bills and had exclusive use of the phone. Investigators found two sources of DNA on the Samsung phone:  Lowery and Brown. The phone also stored pictures of Brown and his family and friends. Phone company records showed about 2,000 contacts between Brown and people known to Brown in the time Brown used the phone and 762 contacts between Brown and friends or family members in the week before Davenport-Ray's homicide.

At trial, the State presented evidence obtained from the cell phones found in the SUV and from carrier records, including call records, text messages, and location data. Several witnesses presented cell tower location data that the State used to establish where Brown's and Lowery's phones were at various times. Those records include a call from Brown to Lowery in the evening before the shooting. Lowery did not answer the call, and Brown then texted Lowery, "Man cuz, don't spin me, NEED you right now." Lowery replied, "Was good." Brown asked, "Where you at?" Lowery answered, "30 minutes." Evidence of the carrier's records and the location of cell towers revealed communications between the iPhone and Samsung and that the phones were near each other for about an hour before Davenport-Ray's homicide. Both phones were also near the Elks Club and the scene of Davenport-Ray's death.

That same night Brown and his former long-time girlfriend texted. The former girlfriend said, "Good luck tonight, we'll always have some things in common." She rejected the State's contention she was talking about the murder and said she was talking about her stepchildren with Brown. She also texted Brown, "Let me know if I need to do anything," although she did not recall sending the text. Brown replied, "Yeah, I'm on it. I see those MFs don't/didn't give a fuck about my nigga because a lot of MFs knew about the shit. I swear I'll be on some different type of time from now on."

Other evidence also connected Brown, Robbins, and Lowery to the shooting. Weeks after Davenport-Ray's death, Robbins was shot and killed. At the time of his death, Robbins had an old bullet wound on his right outer thigh that would point to a bullet striking him if he had been sitting in the back passenger seat of a vehicle. Robbins had told his sister he incurred the leg wound while sitting in the back of an SUV.

Acting on a tip, officers questioned Tashara Yeargin, who lived near the scene of Davenport-Ray's shooting. Yeargin's statements to officers about events the night Davenport-Ray died varied. At first, she denied any knowledge. She told investigators she had stayed at her aunt's home that night. Later, she said that she was out with friends on a party bus. Eventually, when officers suggested Robbins and Brown had been in her home, she confirmed they arrived at her house out of breath and asked to use her phone. Later analysis revealed calls originated from Yeargin's phone around the time of Davenport-Ray's death to Brown's longtime former girlfriend and to Robbins' wife. Yeargin acknowledged knowing both women, but she denied calling them while Robbins and Brown were at her house. Shortly after making the calls, the two men left by car. Before leaving, Brown told Yeargin, "[D]on't tell anybody that we were here." Robbins gave her $40.

Yeargin's identification of Brown and Robbins at trial was not always clear. She identified one man who arrived the morning of the shooting as "Jermel," last name unknown, who used the nickname BG. She later responded to questions that identified Jermel as Jermel Robbins. She identified a second man who came in with Robbins as TJ and identified him as Brown.

Yeargin stated she did not want to be involved, was afraid of participating, and even moved from her home because she was scared. She specifically sought a new home with cameras to discourage anyone from "mess[ing] with [her]." Defense counsel on cross elicited testimony that Yeargin was mad at the police and believed she was being held on charges as a pretext when the police really wanted her to testify against Brown. Yeargin testified that police introduced Robbins' and Brown's names into their conversations. But she later testified that their use of Robbins' and Brown's names prompted her to tell the truth. Defense counsel tried to introduce doubt about her identification of Brown by noting Yeargin's prior testimony that she knew other members of Brown's family and they all looked alike. Yet Yeargin testified that she recognized Brown as the person at her house. Yeargin acknowledged she testified differently in a prior proceeding and that she was under the influence of drugs when Brown and Robbins came to her house.

Brown's former girlfriend testified she spoke with Brown the weekend of the wedding. She said she had to call Brown on someone else's phone on the Saturday before Davenport-Ray's death because he lost his. She testified she did not recall talking to Brown during the time he allegedly used Yeargin's phone.

Robbins' wife recalled talking by phone with her husband in the early morning hours, but she denied picking him up at Yeargin's house. On cross, she testified she could not recall the specific day she received the middle-of-the-night call from Robbins.

7

Evidence at trial covered Brown's activities after the shooting. The prosecutor used this evidence to show he fled and to otherwise suggest the circumstances evidenced his guilt. One theme related to him abandoning a job he had held for years. He reported to work hours after the shooting and again the next day. After that, he never returned. Brown's employer eventually terminated him for job abandonment. Law enforcement located and arrested Brown in Missouri. At the time of his arrest, police seized a phone from Brown. That phone showed Brown had forwarded to his former girlfriend a newspaper article reporting on Davenport-Ray's murder. The two discussed Ray's handling of his wife's murder. The phone also included an exchange with Brown's uncle in which Brown said things looked bad and he needed a good attorney.

The jury found Brown guilty of murder in the first degree, attempted murder in the first degree, conspiracy to commit murder in the first degree, criminal solicitation to commit murder in the first degree, aggravated assault, criminal possession of a weapon, and criminal discharge of a firearm. At sentencing, Brown received a hard 25 life sentence for first-degree murder, another 653-month sentence for the attempted first-degree murder to run consecutive to the life sentence, and concurrent terms for the remaining counts.

Brown appeals, and this court has jurisdiction to consider his arguments. See K.S.A. 60-2101(b) (Supreme Court jurisdiction over direct appeals governed by K.S.A. 2021 Supp. 22-3601); K.S.A. 2021 Supp. 22-3601(b)(3) (direct appeals to Supreme Court allowed for life sentence crimes).

ANALYSIS

*1. No reversible error was committed in admitting the map of cell phone transmissions.*

Brown complains of the admission of State's Exhibits 397 and 398 over his hearsay objection. These exhibits are maps created by a police detective that show cell towers and the locations of the cell phones found in the SUV at certain times the night of the shooting. State's Exhibit 397 reflected data associated with Lowery's iPhone, and Exhibit 398 related to the Samsung phone. Brown's trial attorney conducted a voir dire of the detective regarding these exhibits. The detective explained he made the maps from data he pulled "from the National Domestic Communications Assistance Center [NDCAC] that's run by the United States Department of Justice from their secure website. I download their stored data that's provided to them from the cell phone providers." He also explained the providers were required by law to report the data to the Department of Justice, and the secure website was available to law enforcement to assist in investigations. The detective stated he then imported the data into software to create the maps. The maps show locations of various cell towers in Topeka and the radius each tower covers. He added pins to the maps to show where phones associated with Brown or Lowery pinged a tower's sector near the Rays' travels.

Following the voir dire, Brown's attorney objected: "These are hearsay, Your Honor. We don't have any foundation for how these were created[,] and they were not created by him." In the ensuing discussion, neither the attorneys nor the judge discussed whether the evidence was hearsay and, if so, whether a hearsay exception applied. Given that record, the State argues Brown thus failed to preserve an objection based on hearsay and that he mainly argued foundation at trial and now attempts to focus on hearsay. See *State v. Bryant*, 272 Kan. 1204, 1208, 38 P.3d 661 (2002) ("[A] defendant may not object to the introduction of evidence on one ground at trial, and then assert a different objection

on appeal."). But Brown's counsel did make a hearsay objection during trial, and thus preserved the objection. See K.S.A. 60-404 (prohibiting setting aside a verdict when a party fails to timely object to evidence).

Even so, we do not reach the merits of Brown's arguments for two reasons.

First, only State's Exhibit 398 appears in the record on appeal. Brown's failure to include Exhibit 397 in the record places any error based on its admission beyond this court's review. See Supreme Court Rule 3.01(b) (2022 Kan. S. Ct. R. at 20); see also *State v. Decker*, 275 Kan. 502, 507, 66 P.3d 915 (2003) (concluding this court could not determine whether trial court erred when appellant failed to include photograph complained of in the record on appeal). We therefore limit our consideration to Exhibit 398.

Second, as to State's Exhibit 398, we elect to presume error and consider whether the error demands reversing Brown's convictions. We do so because the trial record related to Brown's objection is less than clear, making it difficult for us or the parties to analyze. The lack of discussion about the hearsay objection provides no clue as to whether the district court judge determined no hearsay was presented or whether the evidence contained hearsay subject to one of the hearsay exceptions provided in K.S.A. 2021 Supp. 60-460. In an apparent attempt to overcome this lack of clarity, Brown's appellate counsel suggests "it appears to Brown the district court ruled the exhibits fell within the business records exception contained in K.S.A. 60-460(m)." The State argues the evidence was not hearsay, and it contends that Brown is really talking about a lack of foundation.

In addition to little discussion about whether the evidence was hearsay, the parties have only briefly talked about hearsay exceptions. It may be the judge did rely on K.S.A.

2021 Supp. 60-460(m). We decline to engage in that speculation, however, especially because other exceptions might apply, and each would require a different analysis that the parties do not address. E.g., K.S.A. 2021 Supp. 60-460(o) (content of official record) or (bb) (commercial lists and the like).

While the State argues we should not consider the arguments because Brown did not develop the record, we cannot ignore that the State was the proponent of the evidence and had the burden at trial of explaining the basis for admission. The lack of record here falls on everyone—prosecution, defense, and the court. Given the record and the narrow briefing of the issue, we decide not to fully explore the basis for the objection but will instead assume a hearsay error—that is, a statutory violation.

Assuming error does not end our analysis. We also need to consider whether the error is reversible. Under K.S.A. 2021 Supp. 60-261 and K.S.A. 60-2105 a trial error is reversible only if it prejudices a defendant's substantial rights. Here, because Brown contends the court violated his statutory right to the exclusion of certain hearsay evidence, the so-called statutory harmless error test applies. Under that test, the State, as the party benefitting from the assumed error, has the burden to show there is not "a reasonable probability that the error will or did affect the outcome of the trial in light of the entire record." *State v. Ward*, 292 Kan. 541, 569, 256 P.3d 801 (2011). The State easily meets that burden by pointing us to the large volume of cumulative evidence that came into the record of this case without objection.

The cumulative evidence most analogous to the information on State's Exhibit 398 is the Samsung phone's cell provider's records found in State's Exhibit 321. The State introduced Exhibit 321 through the testimony of a Senior Trial Specialist in the Law Enforcement Relations Group at T-Mobile Metro. Exhibit 321 included records revealing the date, time, and duration of phone calls from the Samsung phone, whether each call

11

was incoming or outgoing, and the cell site location at the beginning and end of each call. The witness explained the information, telling the jury that cell towers are usually divided into three sectors. Location information includes which sector the phone used with the historical information providing a general range from the tower within the sector, but not a specific location for the phone. Typically, a phone looks for the strongest, closest signal. He also explained that the range of a tower varies from 1 to 3 miles in an area like Topeka.

Exhibit 321 includes a video file containing maps showing the location of towers and the times certain phone calls pinged those towers. These maps differ from Exhibit 398 to the extent that they do not include cell tower numbers. But jurors could determine those numbers by comparing the call information on the maps to an Excel file in Exhibit 321, which includes call information and towers pinged. Our review of the maps and Excel files confirms the tower numbers shown on Exhibit 398 track the towers' addresses, latitudes, and longitudes reflected in Exhibit 321.

Several witnesses orally explained the data and drew conclusions about the locations of the cell phones at various times that night. Again, Brown made no objection to this testimony, which duplicates aspects of the map he now objects to on appeal.

In sum, State's Exhibit 398 and related testimony are cumulative of other testimony and exhibits found elsewhere in the record—testimony and exhibits admitted without objection and not challenged in this appeal. We, therefore, conclude there is no reasonable probability the admission of Exhibit 298 affected the outcome of Brown's trial given the entire record. See K.S.A. 2021 Supp 60-261; *Ward*, 292 Kan. at 569. Any error in the admission of Exhibit 398 was thus harmless.

*2. Prosecutor's errors during closing argument were harmless.*

Brown next points to the prosecutor's statements during closing argument as prosecutorial error. Brown calls out the prosecutor's use of the phrase "we know" as she argued seven points supporting Brown's guilt. Brown also argues the State erred in asserting, "He [Brown] is responsible." We will first discuss the legal framework for appellate review of prosecutorial error claims, then the caselaw discussing prosecutors' use of "we know" and similar phrases, and finally the specific arguments on which Brown focuses.

2.1. *We follow a two-step legal framework for prosecutorial error claims.*

We use a two-step framework to analyze claims of prosecutorial error.

First, we consider whether the prosecutor stepped outside the wide latitude prosecutors are given to conduct the State's case in a manner that does not offend a defendant's constitutional right to a fair trial. *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016); *State v. King*, 308 Kan. 16, 30, 417 P.3d 1073 (2018). This wide latitude extends to statements made during the prosecutor's opening statement and closing argument. We do not consider any statement in isolation but look to the statement's context to determine whether error occurred. *State v. Timley*, 311 Kan. 944, 949-50, 469 P.3d 54 (2020).

Second, "[i]f error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman* [*v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)]." *Sherman*, 305 Kan. at 109. Under this test, "prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not

affect the outcome of the trial in light of the entire record, i.e., where there is no reasonable possibility that the error contributed to the verdict.'" 305 Kan. at 109 (quoting *Ward*, 292 Kan. 541, Syl. ¶ 6).

2.2.    Use of "*we know" is often outside the prosecutor's wide latitude.*

Turning to the first step, our caselaw often recognizes a prosecutor has the latitude during closing argument to highlight the evidence presented and to draw reasonable inferences from that evidence. *Timley*, 311 Kan. at 950. In doing so, a prosecutor may argue the evidence proves a defendant's guilt. But our caselaw does not give a prosecutor latitude to state the prosecutor's opinion about the ultimate issue of the defendant's guilt. *King*, 308 Kan. at 31.

In keeping with this limitation, we have warned prosecutors to not use words that suggest an argument reflects the prosecutor's view. A review of our recent cases reveals phrases such as "I think," "I believe," and "we know" often reflect the prosecutor's views and thus may constitute error. The use of those phrases is not always error, however. Context matters. See *State v. Charles*, 304 Kan. 158, 173-75, 372 P.3d 1109 (2016). Timing also matters to the extent that we have refrained from labeling an impermissible statement an error if we had never given notice to prosecutors that they should not use a particular phrase. See *King*, 308 Kan. at 33-34. This approach reflects the rule that prosecutors "must be evaluated based on the state of the law at the time of" the trial. *Sherman*, 305 Kan. at 117. Despite these considerations, in *King*, we held the prosecutor committed error by repeatedly using the phrase "we know" during closing arguments. 308 Kan. at 34.

Brown cites *King*, 308 Kan. at 33-36, to support his argument the prosecutor committed error. In *King*, we relied on *State v. Corbett*, 281 Kan. 294, 315-16, 130 P.3d 1179 (2006), in holding the prosecutor erred by repeatedly using the phrase "we know."

14

We acknowledged in *King* that *Corbett* recognized a prosecutor discussing *uncontroverted* evidence could appropriately use "we know." But *Corbett* also gave notice that a prosecutor commits error by using "we know" when discussing *controverted* evidence because doing so improperly expresses the prosecutor's opinion. See *King*, 308 Kan. at 34-35. We recently reaffirmed use of "we know" statements is prosecutorial error when the phrase precedes a discussion of controverted evidence in *State v. Alfaro-Valleda*, 314 Kan. 526, 538-39, 502 P.3d 66 (2022) (discussing *King* and *State v. Douglas*, 313 Kan. 704, 490 P.3d 34 [2021]). In sum, these cases hold that, "[i]f a prosecutor uses the words 'we know' when drawing inferences for the jury rather than recounting uncontroverted evidence, the prosecutor errs even if drawing a reasonable inference." 314 Kan. 526, Syl. ¶ 2.

In *King*, three "we know" statements arose in the context of the prosecutor discussing controverted evidence and asking the jury to draw inferences from that evidence. In the first statement, the prosecutor said, "[W]e know based on what you can see in all the videos and the still photos that have been taken that those Easton batting gloves [referencing gloves found in a car on the defendant's driveway] are used in every robbery." 308 Kan. at 34. This statement required inferring the gloves found in the car were the same batting gloves described by witnesses or shown in security surveillance videos from various locations where robberies had occurred. In the second statement, the prosecutor said "we know" that the defendant was at a particular robbery scene because a victim's blood was found on the defendant's boot recovered from the defendant's bedroom. This statement drew inferences that the defendant wore the boot while committing a crime and that it was during the commission of that crime that a victim's blood transferred to the defendant's shoe. And in the final "we know" statement, the prosecutor asked the jury to infer the defendant's involvement in the alleged crimes because "[w]e know that they shared in money" based on coin wrappers found in each coconspirator's house and evidence that robbers took coins from various locations.

15

We held each of these "we know" statements constituted error. 308 Kan. at 34. In conclusion, we held that "drawing inferences for the jury, not stating uncontroverted evidence . . . [was] error, even if the inferences being drawn were reasonable." *King*, 308 Kan. at 34.

Comparing the prosecutor's arguments about Brown's guilt to those in *King*, Brown argues the prosecutor committed multiple errors.

### 2.3.     *Here, the prosecutor erred by repeatedly saying, "We know."*

Before we discuss each of the prosecutor's "we know" statements, we address the State's argument about timing and lack of notice. It argues we should not find error because we decided *King* after this case went to trial and the prosecutor thus did not have notice that use of "we know" constituted error. We reject this argument because, while Brown's trial was before our decision in *King*, in *King* we held that *Corbett* had given prosecutor's notice not to use the words "we know." *King*, 308 Kan. at 34. This holding contrasts with our discussion in *King* about the prosecutor's lack of notice not to use the phrase "I think." 308 Kan. at 33-34 (holding "I think" comments "are impermissible conveyances of the prosecutor's opinion to the jury. . . [but] we decline to find the comments were error in this case because when the prosecutor made these statements at King's trial, we had not yet placed prosecutors on notice that such comments were improper").

Here, the prosecutor had notice. *Corbett* predates Brown's trial by 10 years, and it made clear "we know" was properly used only if it "does not indicate [the prosecutor's] personal opinion[] but demonstrates that the evidence was uncontroverted." *Corbett*, 281 Kan. at 315. And we applied the holding from *Corbett* to find prosecutorial error in *King*, and that trial was before Brown's. 308 Kan. at 34. The State does not provide any reason

16

for a different result here. And we see none. We reaffirm our holding in *Corbett* and the holding in *King*, that prosecutors had notice not to use the phrase "we know" to discuss contested evidence. We now apply that rule.

Here, each of the "we know" statements about which Brown complains related to controverted matters and required the jury draw one or more inferences from the evidence. These statements included:

(1)     "The first reason we know that the defendant is guilty is the phone evidence in this case" and "we know that the Samsung was in the area of the Elks Club, just like the iPhone was in the area of the Elks Club."

(2)     "[R]eason No. 2 that we know the defendant is guilty is the DNA evidence."

(3)     "What we know is common sense. The defendant is in the front passenger seat beginning his firing and keeping his firing as the SUV passes the Dodge Charger. Reason No. 4 that the defendant is guilty is simply common sense."

(4)     "[T]he defendant, as you know is charged with a murder," and "[t]he reason we know that those guys acted together is because Awnterio Lowery, Jermal Robbins, both of their DNA was in the SUV," and the "defendant's [DNA] is close by."

(5)     "Reason No. 6 . . . to show that the defendant is guilty, is simply that we know the defendant left. He ran."

(6)     "[W]e know the defendant acted intentionally because he reeled off enough rounds."

We agree with Brown's contention that the prosecutor erred in each instance. Each statement related to a contested point, and each required the jury to draw inferences. For example, the first point about the phone evidence required inferring: (1) the Samsung

17

phone was Brown's despite being linked to another person's account, (2) Brown physically possessed the phone the night of Davenport-Ray's death, (3) the Samsung's location within the cell tower's sector was near the Elks Club rather that somewhere else within the sector, and (4) the iPhone associated with Lowery was also located near the Elks Club rather than somewhere else within the sector covered by the tower.

Similarly, when considering the other statements, the jury had to rely on controverted evidence to make inferences from the evidence to conclude Brown fired shots from the front passenger seat, he repeatedly fired shots and that action demonstrated his intent, he conspired with Lowery and Robbins, and he left his job and relocated out of guilt.

Given the controverted nature of each reason listed by the prosecutor and the inferences the jury needed to make to reach the conclusions the prosecutor promoted, her repeated use of "we know" was prosecutorial error. See *Alfaro-Valleda*, 314 Kan. at 539 (reiterating the general rule that an inference, even a reasonable one, captures the prosecutor's thought process or opinion and is not an uncontroverted fact).

2.4.    *The prosecutor erred in another argument.*

Brown also argues the prosecutor erred in the final sentences of her closing argument and in making similar statements throughout the argument. At the end of her argument, she said:  "[T]hese crimes took place because the defendant fired into a vehicle that contained three people. He is responsible. Those seven reasons show that he is responsible for every single charge pending against him." Brown makes two arguments.

He first contends the evidence does not support the contention that Brown fired into the Charger because DNA testing excluded him as a contributor to the DNA mixture

found on the gun. While it is true no DNA tied Brown to the gun, the evidence left room for the jury to draw a reasonable inference he shot the gun. Circumstantial evidence suggested Brown was in the car, and injuries suffered by Lowery and Robbins suggest Lowery drove and Robbins sat in the rear seat. Ray's testimony and other evidence suggested shots were fired from the front passenger seat. And evidence supports an inference Brown wore gloves the night of the shooting, which could explain why he did not transfer DNA to the gun. Considering the entire record, the prosecutor's comments were a fair inference drawn from the evidence presented at trial.

In his second argument, Brown contends the prosecutor's "[h]e is responsible" statement violates this court's holding in *State v. Peppers*, 294 Kan. 377, 399-400, 276 P.3d 148 (2012). There, while acknowledging a prosecutor may argue evidence shows an accused's guilt, we held the prosecutor should avoid saying things like the defendant is guilty "[b]ecause he did it" without directing the jury back to the evidence. Otherwise, the failure to include directional language, such as "the evidence shows the defendant's guilt," renders the statements an impermissible expression of the prosecutor's opinion. 294 Kan. at 400. The prosecutor's statements at the end of closing argument that "he is responsible" did not use directional language to point the jury back to the evidence. As Brown argues, the prosecutor thus offered improper expressions of her opinion that constitute error under *Peppers*.

### 2.5. *Prosecutorial error was individually and cumulatively harmless.*

Brown argues the prosecutor's errors are individually prejudicial to the point they require a new trial and cumulatively they do even more harm to his right to a fair trial. We agree that the prosecutor's repeated use of the prohibited "we know" phrase is troubling. But the repetition is just one aspect of our consideration. When determining if prosecutorial error causes prejudice, "[a]ppellate courts must simply consider any and all

19

alleged indicators of prejudice, as argued by the parties, and then determine whether the State has met its burden—*i.e.*, shown that there is no reasonable possibility that the error contributed to the verdict." *Sherman*, 305 Kan. at 111. The strength of the evidence may inform this inquiry, but it is not our primary focus, for prejudice may be found even in strong cases. 305 Kan. at 111 (citing *United State v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 240, 60 S. Ct. 811, 84 L. Ed. 129 [1940]).

Here, the State relies on the jury instructions; the context of the statements and, more specifically, that the prosecutor surrounded the statements with a discussion of the evidence; the reasonableness of the inferences the prosecutor asked the jury to draw; and the overall strength of the evidence. Before we discuss the evidence and the record, we will address the argument about the district court's instructions to the jury before closing argument.

Appellate courts often weigh these instructions when considering whether any prosecutorial error is harmless. In doing so, we presume the jurors follow the instructions. See, e.g., *Alfaro-Valleda*, 314 Kan. at 545-46. District courts commonly instruct the jury that "[s]tatements, arguments, and remarks of counsel are intended to help you in understanding the evidence and in applying the law, but they are not evidence. If any statements are made that are not supported by evidence, they should be disregarded." Through these words, jurors know prosecutors are advocates, and appellate courts can weigh that in determining whether a prosecutor's error is harmless. See *Timley*, 311 Kan. at 951. Here, the district court gave that instruction. It also reminded the jury that it was for the jurors "to determine the weight and credit to be given the testimony of each witness." We weigh these instructions in considering whether the prosecutor's errors affected the verdict.

20

We next turn to the State's argument about context. We agree that each time the prosecutor used the words "we know" she did so in the context of discussing evidence that supported the conclusion. For example, after commenting that one reason "we know that the defendant is guilty is the phone evidence in this case" and "we know that the Samsung was in the area of the Elks Club, just like the iPhone was in the area of the Elks Club," the prosecutor thoroughly reviewed the cell phone evidence. In doing so, she first detailed the evidence supporting the inferences that Brown used the Samsung phone found in the SUV in the weeks and hours before Davenport-Ray's death. This was mostly evidence of the many texts, calls, and pictures found on the Samsung to and about Brown's friends and family. The prosecutor also highlighted evidence supporting the second inference that the Samsung had been near the Elks Club and the location of the shooting. In doing so, she acknowledged differences in testimony of the State's witnesses. For example, she referred to the testimony of the Senior Trial Specialist from T-Mobile Metro describing the sector covered by each tower as ranging from 1 to 3 miles, not just the 1-mile radius the police detective had drawn on his maps. She explained reasons the jury could still infer that both the Samsung and the iPhone had been near where the newlyweds celebrated and the scene of Davenport-Ray's shooting.

Likewise, the prosecutor followed the "we know" statement relating to DNA evidence by explaining the places investigators found the evidence and reviewing the scientific evidence supporting the inference that Brown contributed to the DNA samples. And, again, the prosecutor was candid, commenting, "There was some question as to why we didn't have any of the defendant's DNA in the car. The defendant could not be excluded from the front driver's air bag. The numbers are not big, the numbers are small." This context informed the jury it had to weigh the evidence.

In each other instance of a "we know" argument, the prosecutor discussed the evidence that supported the inference, which often built on the inferences related to the

phone and DNA evidence. In general, the inferences were reasonable, and most were compelling. And each time, the prosecutor discussed evidence that weighed against the State's case, such as the lack of DNA evidence definitively putting Brown in the SUV. The context of this discussion underscored for the jury that it needed to consider how, and if, the evidence supported each of the seven reasons the prosecutor listed.

As to the reasonableness of the inferences and the strength of the evidence factors argued by the State, the inferences were reasonable and the evidence was sufficient to show beyond a reasonable doubt that Brown was in contact with Lowery before the homicide in this case (both through text messages and phone calls made before the homicide as well as cell phone location data showing that their phones were near each other just before and at the time of the shooting). Lowery's on-scene apprehension, the eyewitness' identification of him as the SUV's driver, and the discovery of Brown's phone in the SUV made the cell phone evidence connecting him and Brown that evening compelling. And Robbins' DNA taken from the interior of the SUV strongly supports a conclusion that Robbins was present. Yeargin's testimony and phone calls made from her phone to Brown's former girlfriend and Robbins' wife on Yeargin's phone provide evidence connecting Brown to Robbins at the time of the shooting. And Brown's DNA on the latex gloves found on the path of the two occupants who fled from the car also provides convincing evidence of Brown's presence. Circumstantial evidence establishes that Robbins sat in the backseat of the SUV, allowing for reasonable inferences that Brown was in the passenger seat of the car when the multiple shots were fired. Finally, as to the last inference, the prosecutor reviewed the evidence establishing that Brown abandoned a job he held for years within days of the shooting without notifying his employer. From the totality of the evidence a jury could reasonably infer he had fled out of guilt.

22

Nothing suggests to us that the jurors would have reached a different verdict had the prosecutor more appropriately couched the seven reasons for finding Brown guilty in terms of statements like "the evidence shows." In summary, we have considered the strength of the evidence against Brown, the context of each "we know" statement as part of the discussion of the evidence the jury should weigh, and the court's instruction charging the jurors with the duty to weigh the evidence and consider counsel's arguments as just that, not as evidence. Those factors considered in context of the entire record convince us the State met its burden of establishing beyond a reasonable doubt there is no reasonable possibility the errors individually or cumulatively contributed to the verdict.

3. *Cumulative error does not require reversal of Brown's convictions.*

Finally, Brown argues cumulative error requires us to reverse his convictions. We have assumed error in the admission of Exhibit 398 and identified error in the prosecutor's closing argument. Our standard when considering cumulative error arguments is well settled:

> "The test for cumulative error is whether the errors substantially prejudiced the defendant and denied the defendant a fair trial given the totality of the circumstances. In making the assessment, an appellate court examines the errors in context, considers how the district court judge addressed the errors, reviews the nature and number of errors and whether they are connected, and weighs the strength of the evidence. . . . If any of the errors being aggregated are constitutional, the constitutional harmless error test of *Chapman* applies, and the party benefitting from the errors must establish beyond a reasonable doubt that the cumulative effect of the errors did not affect the outcome. . . . Where, as here, the State benefitted from the errors, it has the burden of establishing the errors were harmless." *State v. Thomas*, 311 Kan. 905, 914, 468 P.3d 323 (2020).

In applying this standard, we note that State's Exhibit 398 and the first asserted "we know" error during closing argument both relate to evidence from phone records.

There is thus some interrelationship among the errors. But the errors occurred on separate days of the trial, with enough time between them that the jury was unlikely to associate one with the other. We also discount for the cumulative error analysis any error in the admission of exhibit 398 because the data underlying the exhibit was also found in other exhibits not challenged in this appeal. While the prosecutor erred in saying "we know," the evidence allowed a reasonable and convincing inference that Brown possessed the phone at certain locations significant to this case. And, given the jury instructions, the jurors knew it was their role to consider that evidence to see if it supported the inferences and if the inferences supported convicting Brown. So, while there is an interrelation among these two errors, they do not accumulate to cause substantial prejudice or an unfair trial.

As we have discussed, we do not find the prosecutor's errors to be cumulatively prejudicial. We see no other basis for concluding cumulative error supports reversal here. We thus hold that cumulative error doctrine does not require reversing Brown's convictions.

CONCLUSION

While we find error, we have concluded the State met its burden of establishing beyond a reasonable doubt the errors did not affect the jury's verdict. We therefore affirm Brown's convictions and his sentences.

Affirmed.

WILSON, J., not participating.

24